[No. S058025. Nov. 18, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD DON FOSTER, Defendant and Appellant.

1302

## COUNSEL

William D. Farber, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—A jury convicted Richard Don Foster of the first degree murder of Gail Johnson (Pen. Code, §§ 187, subd. (a), 189), second degree burglary (Pen. Code, § 459), and second degree robbery (Pen. Code, § 211).[1] The jury found true the special circumstance allegations that the murder was committed while defendant was engaged in the commission or attempted commission of burglary and robbery. (§ 190.2, subd. (a)(17)(A), (G).) The jury also found true the allegation that defendant personally used a dangerous and deadly weapon, a knife, in connection with the murder and the robbery. (§ 12022, subd. (b).) The jury further found that defendant previously had been convicted of two serious or violent felonies. (§ 667, subd. (a).) Following the penalty phase of the trial, the jury returned a verdict of death. Defendant moved for a new trial (§ 1181), to strike the special circumstances, and for modification of the penalty to life imprisonment without the possibility of parole (§ 190.4, subd. (e)). The trial court denied these motions, sentenced defendant to death, imposed sentence on the noncapital offenses, and ordered restitution in the amount of $200. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase Evidence*

#### 1. *The prosecution case*

##### a. *Summary*

In the afternoon of August 26, 1991, Gail Johnson's body was found on the floor of the minister's office in the High Desert Church of Religious Science in Apple Valley (the church). She had been stabbed at least eight times. Her purse was found on the floor near her body, and her wallet was missing. Blood found in the minister's office matched defendant's blood, and the combination of 10 particular sequences of DNA found in the blood would be expected to occur in approximately one in every 24 million individuals. The victim's vehicle was found in the parking lot of a business that defendant visited on the day of the crimes. Her wallet was retrieved from a mine shaft in which defendant previously had disposed of other items. A pair of jeans, stained with blood consistent with the victim's blood, also was found in the mine shaft and was the same brand and size as the jeans worn by defendant on the day he was arrested. A bloodstain on a piece of tissue paper found in the mine shaft was consistent with defendant's blood. Defendant had visited

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

the church two days prior to the date of the crimes. Evidence was received establishing defendant's commission of two prior offenses in which he found women alone in an office and returned to rob and assault them.

### b. *The day of the crimes*

Loren West testified that on Monday, August 26, 1991, he visited the church at approximately 11:20 a.m. to repair the air-conditioning, at which time the victim, Gail Johnson, was in the church office. West recalled opening a locked box of electrical fuses with a key that he obtained from a box provided by the victim. After replacing a fuse, he returned the key to the victim in the church office and departed from the church at approximately 11:45 a.m. He stated that he saw only one vehicle, other than his own, in the church parking lot, and that the victim was the only person he saw at the church. At trial, West was shown a photograph of the keys spread out in a wooden tray at the church office, and testified he "would not have left the key box open with keys laying everywhere."

William Rosenthal testified that when he arrived at the church at approximately 1:00 p.m. that day to deliver stationery, he did not observe any other vehicles in the parking lot or any other persons in the church office. When he looked into the minister's personal office, he saw a person lying on the floor next to the desk. When he called into the minister's office, the person did not respond. He reported his discovery to his manager and called 911.

Mike Malloy, who was working that day as an engineer employed by the Apple Valley Fire District, testified that at approximately 1:00 p.m., he was assigned to respond to a call regarding "a person down" at the church. He located the victim on the floor in the minister's office, on her back, fully clothed, with blood on her shirt. Malloy determined she was not breathing and had no pulse. He testified that after an EKG (electrocardiogram) test revealed that "her heart was systole [*sic*] . . . or flat-lined," he did not attempt to revive her.

### c. *Crime-scene evidence*

Dr. Frank Sheridan, the chief medical examiner for the County of San Bernardino, conducted an autopsy. He testified the victim was 53 years of age, 64 inches tall, and weighed 140 pounds. He described numerous defensive wounds on the victim's hands and arms, and confirmed that these wounds "could occur . . . if someone is slashing at her . . . and she's trying to ward off the blows." He stated there were bruises on the right side of her nose and jawline that were consistent with being punched, and a bruise on the back of her head that probably occurred when the victim fell backward. All of these wounds were inflicted while the victim was alive.

Sheridan testified that the victim was stabbed once in the neck and at least seven times in the chest. He did not find anything, such as indentations on the victim's skin, indicating that the knife used in the attack had a handguard that would have prevented the perpetrator's hand from slipping past the handle. He testified that the neck wound was not as deep as the others, and might have been inflicted while the victim was standing and the perpetrator held the knife at her neck. One of the chest wounds was caused by two stabs through the sternum. Sheridan agreed that if the perpetrator's hand had blood on it when the knife hit the sternum, the perpetrator could have lost his grip and been cut. Sheridan concluded the victim was lying on her back when the chest wounds were inflicted, because she had a bruise on the back of her head, the chest wounds occurred in quick succession, and two of the wounds extended to the back of the ribcage, indicating that the force of the thrust did not push her body back.

Sheridan examined a photograph of defendant's right hand taken approximately two weeks after the murder. He testified that an injury on defendant's palm was consistent with one that would be suffered if a person were to stab with a knife and the knife were to slip. Sheridan also testified that defendant's wound would have bled and was consistent with the injury having occurred two weeks earlier.

David Stockwell, a criminalist in the San Bernardino County Sheriff's Department, was assigned to assist in the collection of evidence from the crime scene. He testified that the victim's body was found on the floor of the minister's office, on her back, between the desk and the wall of the office. Under the desk were numerous items that appeared to be from a purse, and a purse was beneath shelves that were affixed to the wall. One of the victim's shoes was on the floor near her foot, and her other shoe was on the desk.[2] A telephone and telephone cord also were on the floor, and the office window was broken. Stockwell was aware that a key was found in the trash can in the minister's office. He observed blood on numerous items in the minister's office.

Stockwell received blood samples from the victim and defendant, which he analyzed to determine 11 genetic markers. His analysis did not involve DNA directly, but focused instead upon particular proteins produced pursuant to the donor's DNA coding. He testified that the 11 particular markers in defendant's blood appear most frequently in the Caucasian population, and those 11 markers are found in one in 42,600 Caucasian individuals.

---

[2] Malloy, the paramedic, testified that he had moved the victim's body one or two feet away from a bookcase but could not recall whether shoes were on her feet.

Stockwell analyzed numerous bloodstains found in the church but was unable to test every stain he collected for each of these 11 genetic markers, because some of the samples were too small.[3] All of the bloodstains for which Stockwell obtained testing results were (1) consistent with the victim's blood, (2) consistent with defendant's blood, or (3) consistent with a mixture of both individuals' blood. He testified that stains on the victim and on her clothing, and a blood smear on an ottoman located next to her body, were consistent with the victim's blood. Bloodstains found on the window blinds in the minister's office apparently had been deposited as a result of being flung with some force from a moving object and were consistent with the victim's blood. Stockwell analyzed samples obtained from the purse and concluded two smears were consistent with the victim's blood, three drops were consistent with defendant's blood, and two drops were consistent with a mixture of blood from both individuals. Stockwell explained that because the mixtures appeared within single drops of blood, the two sources of blood must have mixed before contacting the surface of the purse. Bloodstains consistent with a mixture of the victim's blood and defendant's blood also were collected from the desk, the chair, two shelves of the bookcase, one of the shelves affixed to the wall, and the carpet in the minister's office. Mixed stains also were found on the carpet outside the minister's office and on the floor of the church foyer. Finally, bloodstains consistent with only defendant's blood were found on the carpet in the minister's office, the floor at the entrance to the church office, the floor of the foyer, and the drinking fountain in the foyer.

Stockwell testified that samples of the victim's blood and defendant's blood, and a sample of a drop of blood obtained from the purse that was consistent with defendant's blood, were sent to Cellmark Diagnostics for DNA analysis. Dr. Robin Cotton, the laboratory director at Cellmark, explained that her laboratory extracts DNA from cells and analyzes certain DNA sequences that vary in length among individuals. At Cellmark's laboratory, five locations of the DNA from each of these three blood samples were examined. Each location of the DNA generated two distinct lengths or "bands," representing the DNA received from each parent and resulting in 10 bands to compare. Cotton testified that all 10 of the bands from the blood on the purse matched the bands from defendant's blood. She also testified that the presence of all 10 of these bands would occur in approximately one in every 24 million individuals.

---

[3] Stockwell also testified that many of the bloodstains in the church had been covered with a white liquid or a white powder spray, and these white substances rendered the genetic tests on such stains inconclusive. He did not analyze the liquid or the powder but testified that patches of the white liquid on the floor in the foyer led to the men's restroom, where he noticed a can of Right Guard deodorant and an empty bottle that appeared to him to have held hand lotion. Dr. Sheridan reported noticing a white substance on the victim's body and pants, which he described as liquid soap.

Gilbert Johnson, the husband of the victim, testified that she worked as a volunteer at the church. He identified the purse found in the minister's office as belonging to his wife, and numerous items found on the floor next to her body as normally kept by her in her purse. He also testified that she had a habit of keeping at least $50 in her purse. According to Johnson, his wife was strong willed and would have resisted an attempt to rob or rape her.

### d. *Evidence obtained from other sites*

On August 26, 1991, at approximately 10:00 p.m., San Bernardino County Deputy Sheriff Phil Brown located the victim's vehicle in the parking lot of a Lucky store in Apple Valley. Brown testified that the driving distance between the church and the parking lot was one and one-half miles. Jeffrey Smink, a forensic specialist with the sheriff's department, testified that he did not find any fingerprints in the passenger compartment but located a blood-stain on the passenger seat. Stockwell testified that this stain was consistent with a mixture of the victim's blood and defendant's blood.

On September 10, 1991, Thomas Bradford, a detective with the San Bernardino County Sheriff's Department, together with defendant's parole officer, Steven Slaten, visited defendant at his residence. Bradford testified that he took possession of the clothes defendant was wearing, including Rustler brand blue jeans with a 33-inch waist and a 30-inch length, and a blue T-shirt.

On January 11, 1992, Curtis Edwards and his brother found the victim's wallet in a mine shaft while the two men were prospecting in the Mojave Desert. Edwards testified that the wallet did not contain any cash. He delivered it to the sheriff's department. On January 18, the Edwards brothers led Detective Bradford to the mine shaft. Bradford testified that he found a pair of Rustler brand blue jeans, with a 33-inch waist and a 30-inch length, and a blue T-shirt in the mine shaft, which was located 2.2 miles from defendant's residence.

Stockwell analyzed bloodstains found on the pair of jeans and on a piece of tissue paper found in the mine shaft. He testified that a stain "just above or right on the right knee" of the jeans was a "saturating" stain, indicating that the "fabric had come in contact with a fair amount of blood that soaked into that knee area." He agreed that such a stain would be formed "if . . . [the victim's] blood was on the ground and [the person wearing the jeans] put their knee in it." He stated that, due to the passage of time and the conditions in the mine shaft, the blood had degraded, and he obtained results for only two genetic markers, both of which were consistent with the victim's blood. With respect to the tissue paper, Stockwell testified that it was "crumpled,"

with what appeared to be a contact blood smear, "as if someone was grasping that particular item and the blood from the hand would have bled onto that piece of paper." Stockwell obtained results for three genetic markers from the tissue paper, each of which matched defendant's blood.

### e. *Defendant's visit to the church on Saturday, August 24, 1991*

Irma Plate, the minister of the church, testified that she attended a meeting at the church on Saturday, August 24, 1991 (two days prior to the murder). She recalled that, at some point that afternoon, Nina Pittsford, a church member, asked her to speak to a man who had come to the church but was not part of the meeting. The man identified himself as Martin Jennings and stated that his mother had been hospitalized.[4] He asked Plate to pray for his mother. Plate invited him to write a prayer request and to place it in the church's "prayer request box," which he did. She testified that the man spoke with her for a moment or two, and then departed from the church.

### f. *Prior criminal conduct*

Johnnie C. testified that defendant had robbed and raped her on May 23, 1972, when she was working as a receptionist at the Burns Studio in Boise, Idaho. She recalled that defendant entered the studio at approximately 11:15 a.m., when she was alone in the office, and told her he wanted a photograph of himself to send to his girlfriend. Johnnie testified that defendant left after she scheduled an appointment for him, but he returned five or 10 minutes later and told her she should not call his home, because the portrait was to be a surprise for his family. She recalled that he left again, but returned again five or 10 minutes later, proceeded down the hall toward the studio's workrooms before she was able to return to the receptionist room, and told her he was "going to rob this place." After confirming she was alone, he asked for her purse, which was in the cabinet behind him. She testified that he took $6 or $7 from her purse. When a bell on the front door rang, indicating someone had entered the studio, defendant said, "You better get out there and get rid of them fast or there's going to be a lot of people hurt." As she showed photographic proofs to the customers, she could hear the floor squeak and therefore knew he was standing "right around the corner" watching her.

Johnnie testified that when the customers left, defendant ordered her to return to the workroom and sit on a stool. She saw that he had removed the

---

[4] Defendant confirmed at trial that he was the man who visited the church on Saturday and who identified himself as "Martin Jennings."

money from the cash drawer, which was in the same cabinet as her purse, and had marked over his name in the appointment book. She related that he came toward her and placed his hands on her breast and thigh, and she jumped off the stool and told him to leave her alone and to get away. She recalled that he started hitting her in the face with his fist, splitting open her lip, and then knocked her down. She testified that every time she tried to get up, he knocked her down with his fist. He told her, " 'If you don't stop fighting, I'm going to hurt you really bad.' " She therefore "stopped fighting and just laid there crying and looking off." He then raped her. When he started to leave, he said, " 'You better not call the police and you better forget that you ever saw me or else I'll come back and kill you.' " She recalled that he pulled the telephone from the wall and left through the back door. She reported that she suffered bruises on her face and body, and that he "hit me a lot in the abdomen." She did not see a weapon but thought he told her he had one; although she "was convinced that he did," she could not "swear to it."

After pleading guilty to raping Johnnie C., defendant was sentenced to life in prison in Idaho. Upon his release on parole on January 18, 1982, he moved to Apple Valley, California.

Cindy M. testified that defendant robbed and assaulted her on March 29, 1982, when she was working in the office of a solar energy business in Apple Valley. She testified she was alone in the office when defendant walked in at approximately 11:00 a.m. and told her he was waiting for a real estate agent to show him an office. He asked to use the telephone, but when he attempted to place a call, the telephone was not operative. Cindy then walked to another business's office to contact the telephone company. She recalled that when she returned to her office, defendant inquired whether he could remain there because it was cold and windy outside. She agreed, and he remained in the office until noon, when a friend arrived to go to lunch and Cindy asked defendant to leave.

Soon after Cindy returned to her office at approximately 1:30 p.m., defendant again appeared and inquired whether he could wait in her office. At approximately 1:45 p.m., Cindy walked toward the back of her office to obtain advertising mailers to address, and when she turned around, defendant was standing immediately in front of her. She testified that he "put [a knife] right to my throat" and told her to put down the mailers. He pointed to her purse and asked whether it was hers, and she confirmed it was. He then turned her around so she was facing the door of the bathroom in her office. She recalled that he handed her the purse and told her to give him her money. After she took her wallet out of the purse and gave him the cash, he told her to empty her purse onto the floor, which she did. When asked whether there was any other money, she told him there was cash in a box in a desk drawer,

but he did not move toward that location. Instead, he continued to hold the knife to her throat and moved her into the bathroom. Then he lowered the knife, told her to remove her clothes, and came closer to her. Cindy testified that she "grabbed his hand with the knife in it and I just . . . pushed it towards his . . . body. [¶] And we fought and struggled and then he just started hitting me and he stabbed me, and I went down and he grabbed my hair and he kneed me under the chin, and then we struggled a bit more and he said, 'Try that again, I'll kill you.' " When he came near her again, she "screamed 'No' and pushed and ran out" the bathroom door and through the front door.

Richard Nester was at the front door, about to open it, as Cindy ran from defendant. Cindy recalled telling Nester, "He's got a knife and he's trying to rape me." Nester told her to run, and she escaped to the office of another business. Thereafter, she was treated for a stab wound to the left side of her nose, which went through her nasal passages to the roof of her mouth. She also suffered two black eyes, two fractured teeth, and some bruises.

Richard Nester testified that as he pushed open the front door, Cindy came running from the back of the office, with blood streaming down her face, and screamed at Nester, " 'He's got a knife. He tried to rape me.' " Nester recalled that as he pulled the door closed after Cindy ran out, the person who was following her stuck his right arm out the door and slashed at Nester with a knife as Nester tried to hold the door closed. After five or 10 seconds of struggling to hold the door, Nester ran to the parking lot of a nearby office building and yelled to a man to call the police, but the man drove away. Nester testified that he returned to his vehicle and pursued a person who, having run to a white Datsun truck, drove out of the parking lot ahead of Nester's vehicle. Nester described his pursuit of the Datsun, including his attempt to crowd that vehicle into a guardrail. During the chase, Nester attracted the attention of a sheriff's deputy, who joined the pursuit and subdued the driver of the Datsun. Nester testified that the man in the Datsun was the man whom he encountered in Cindy's office.

Defendant was convicted of robbery and assault with intent to commit rape in connection with his attack upon Cindy M. He was sentenced to 13 years in prison, and was paroled from prison on December 12, 1990.

### 2. The defense case

#### a. Expert testimony

Laurence Mueller, an associate professor in the Department of Ecology and Evolutionary Biology at the University of California, Irvine, testified that the

databases used by Cellmark Diagnostics, which had analyzed the blood samples (see *ante*, at p. 1310), were inadequate for the methods employed by Cellmark. He stated that Cellmark's use of the "product rule"—which involves multiplying the frequencies with which each particular DNA band or length appears in the population—is flawed if the populations from which data is collected are heterogenous rather than homogeneous. According to Mueller, forensic calculations should be based upon the numerous subgroups that make up the major population groups, and should not be reached by treating a large group of numerous subgroups as if the group were homogeneous. Mueller advocated use of the "counting method," pursuant to which the entire genetic profile is compared to each genetic profile in the database and only complete matches are included in the calculations of frequency. Mueller also criticized Cellmark's criteria for determining a match, asserted that Cellmark underestimates the frequency of each length, and faulted Cellmark for not including in its analysis what Mueller described as Cellmark's "Oriental" database. By including the "Oriental" database, and by increasing the interval of the lengths that were considered to be matches, Mueller's application of the product rule arrived at a frequency of defendant's DNA match of one in 3.6 million. Taking into account Cellmark's error rate—which Mueller calculated to be one in 139, based upon a false positive result from a proficiency test in 1988 and a second false positive from such a test in 1989—and using the "counting method," Mueller calculated the frequency of defendant's DNA to be one in 185 or less.

### b. *Defendant's testimony*

Defendant testified that in 1991, he and his stepfather, Art Jennings, lived in two trailers, north of Apple Valley, supporting themselves by collecting recyclable materials. His mother lived out of state, and her health had been deteriorating due to "a peritoneal infection." She passed away on October 25, 1991.

Defendant related that he learned about the Church of Religious Science while imprisoned in Idaho, and had visited the church in Apple Valley in 1982, when its minister was John Dennis. He recalled visiting the church again on August 24, 1991, to see Reverend Dennis, when he learned that Reverend Plate was the new minister. He explained that he introduced himself as his half brother, Martin Jennings,[5] because defendant did not have telephone service and the only telephone number he knew was Martin Jennings's number. He confirmed that he spoke to Reverend Plate about his mother's condition and completed a prayer request, but in contrast to Plate's testimony and the rebuttal testimony of Nina Pittsford, he also testified that he requested, in the presence of Plate and Pittsford, to use the telephone, and

---

[5] See *People v. Jennings* (2010) 50 Cal.4th 616 [114 Cal.Rptr.3d 133, 237 P.3d 474].

that he entered the minister's office and made a call.[6] Defendant testified that he then walked from the church to the Lucky store in Apple Valley, but Art was not there. Defendant then walked to an area containing service stations where he and Art routinely collected recyclable materials, but Art was not there, so he walked home, arriving sometime between 3:00 p.m. and 5:00 p.m.

Defendant testified that on August 26, 1991, the day of the crimes, he and Art worked at home until 9:00 or 10:00 a.m., then drove to a bank, a construction supply store, and a Smart & Final store, where Art purchased chewing tobacco. Defendant initially testified that when he and Art left Smart & Final at approximately 1:30 p.m., they went on the first "run," collecting recyclable materials, finishing that run at approximately 3:00 p.m. When asked whether he went "anywhere near" the church on August 26, he provided a revised account of his day. He testified that the closest he came to the church was the CC Market, which was approximately one block east of the Lucky store in Apple Valley. He stated that he was at the Lucky store at approximately 11:00 a.m. and walked to the CC Market a few minutes later to purchase a carton of cigarettes. He recalled that when he returned to the Lucky store, he could not find Art. He testified that he then walked to the area containing the service stations where he and Art usually collected recyclable materials, but upon not finding Art there, he walked seven or eight miles back to his residence, remaining there until 5:00 or 6:00 p.m., and then walked to visit a nearby family.[7]

With respect to the healing injuries on his right hand, which were photographed on September 10, 1991, defendant testified that these occurred on August 22, 1991, when he was collecting recyclable materials from dumpsters. He stated that although he was left handed, he used both hands when recycling, and that he suffered cuts two or three times a week.

Defendant also testified regarding the mine shaft in which the victim's wallet was found. He recalled that on August 16, 1991, he and Art dumped 10 to 15 loads of nonrecyclable "junk" into the mine shaft in which the

---

[6] Defendant further testified that he made a single telephone call, to the home of his mother and Martin Jennings, reached an answering machine, and terminated the call without leaving a message. He had told an investigator, however, that he had used the minister's telephone to call a hospital and had spoken with a nurse there. He told another investigator that he had spoken to his brother on the minister's telephone.

[7] On cross-examination, defendant testified that the CC Market was approximately one mile from the church, and that it would take him 15 to 20 minutes to walk from the market to the church. He confirmed that if he was at the market at 11:15 a.m. and walked to the church, he would have arrived there at approximately 11:35 or 11:40 a.m. As noted above, Loren West left the church at approximately 11:45 a.m., and William Rosenthal arrived there at approximately 1:00 p.m.

victim's wallet was found, but he claimed the jeans and the T-shirt found in the mine shaft were not his clothes. He stated that the jeans he was wearing on September 10, 1991, which were the same brand and size as the jeans recovered from the mine shaft, were Art's jeans, which he was wearing because he planned to launder his own work pants.

The prosecutor showed defendant a photograph of the inside of defendant's trailer, taken on September 10, 1991. Defendant confirmed that a clean pair of jeans and a blue T-shirt visible in the photograph were his clothes. He also confirmed that seven or eight pairs of clean pants were visible on hangers in the photograph, and that clothing in a bucket on the floor was the laundry he was collecting to wash on September 10. He explained that he was wearing Art's jeans that day because all of his *work* clothes were dirty, and that not all of his jeans were work clothes.

The prosecutor also questioned defendant concerning his prior crimes. Defendant admitted he had robbed and raped Johnnie C. but denied taking her purse, and claimed he hit her only once, did not hit her hard, and did not knock her down. Defendant denied robbing and assaulting Cindy M. He admitted visiting her office to use the telephone in the morning on the day of her assault, but claimed he was in the parking lot in the afternoon when he heard a scream. He testified that he then drove away because he was a parolee, and "the next thing I remember I was up on Apple Valley Road and . . . Nester's truck hit the tailgate of my pick-up."

### 3. *Rebuttal*

Nina Pittsford testified concerning defendant's visit to the church on August 24, 1991. She recalled that defendant told her his mother was hospitalized due to a heart attack. Pittsford stated she did not "feel right" about defendant, and decided to refer him to Plate, the new minister, and to remain near them. She testified that defendant did not enter the minister's office, and she did not hear him ask to use the telephone.

### B. *Penalty Phase Evidence*

### 1. *Prosecution evidence*

Bunny Lynn Miles testified that she received obscene telephone calls from defendant in October and December 1989. When she terminated his calls, he placed additional calls and made threatening statements concerning her daughter, who was 10 years of age. After one of his calls was traced to Art Jennings's telephone, Miles identified defendant's voice at a parole revocation hearing.

Laurel R. testified that on June 13, 1972, when she was 12 years of age, her mother, Dinah J., gave defendant permission to use the telephone at the family home in Boise, Idaho. After defendant left, Laurel noticed that he drove by the house two or three times. Thereafter, she heard her mother screaming for help, and then observed defendant holding a gun to her mother's back. Defendant told Laurel and four other children that if they moved, he would shoot them. Her mother offered to leave the house and cash a check for him in the amount of $100. He agreed, and when he left the house with Laurel's mother, he told the children that the house was being watched and that if they moved, he would shoot them and their mother.

Dinah J. testified that after she allowed defendant to use the telephone, he returned and asked to use her telephone again, and as he followed her inside to make a call, she saw he had a gun. She recounted the events as to which Laurel R. testified, and also described accompanying defendant to a grocery store, where she obtained cash for him. Dinah testified that defendant then drove her to an isolated area, raped her twice, and forced her to orally copulate him. After resisting, she acquiesced when he discharged his firearm in front of her face.

Monica DiVincenzo, the daughter of Gail Johnson, the homicide victim, identified family members who were in photographs found inside the victim's wallet. She testified that she had visited her mother every day, and that her own daughter usually stayed with Johnson on Saturday nights and accompanied her to church on Sundays.

### 2. Defense evidence

Defendant's maternal aunt, Bessie Killebrew, testified that defendant's mother, Pearl, ran away from home at the approximate age of 15 years, and initially was placed in a "girls' home" and later in a mental institution. Subsequently, Pearl and Ray Foster had 11 children. Killebrew testified that the Foster family lived in poverty, and she described Ray Foster's discipline of the children, employing a belt, as "a little harsh." She stated that Ray Foster left the family in 1954, after the eldest daughter, who was then 12 years of age, accused him of molesting her. Killebrew recalled that Pearl and her children left Idaho with Art Jennings in 1955, and that the children were made wards of the State of Nebraska in 1957.

Art Jennings confirmed that he drove with Pearl and her children to Nebraska, but he exhibited difficulty in recalling the names and the number of her children. He denied ever disciplining defendant or any of the other Foster children. He testified that Pearl told him that her daughter Helen had died when her son Larry rolled onto Helen and suffocated her during the night. He

stated that the Foster children were removed from Pearl's custody while Jennings was in jail, and that the Nebraska authorities would not tell him or Pearl where the children were being kept.

Four of defendant's siblings testified concerning their childhood. Larry testified that Pearl and Art beat the children, sometimes while the children were tied up, and forced them to steal. He recalled that the family traveled from state to state, living in Art's vehicle and harvesting crops. He testified that Art killed Larry's sister Helen in the vehicle by smothering her. In 1957, the children were taken by the State of Nebraska and placed in Whitehall Home for Children. Larry stated that a housemother at Whitehall taught both defendant and him about sex, instructing them that "you got to hit them in the mouth before you do anything or they don't like it." He testified that he and defendant were transferred to a state mental institution, where they were beaten and sexually abused and drugs were administered, as were electroshock treatments and "hydrotherapy," which involved transferring the subject from hot water to ice water and back again. Defendant's sister Wilma provided similar testimony concerning their time with Art and Pearl and at Whitehall, and also testified that Pearl accused defendant of smothering Helen. Another sibling, Steven, corroborated the foregoing testimony and also recounted that "the first sexual experiences were the girls with Art and the boys with mom." The eldest daughter, who ran away before Art joined the family, testified that her father molested her, with Pearl's knowledge, and that Pearl blamed the daughter for the molestation.

Defendant provided similar descriptions of his childhood and additional details about his life. Before being sent to Whitehall, he had attended school for a total of five months. At Whitehall, at 10 years of age, he was placed in first grade, remaining at that level for two years. During his third year at Whitehall, he attended eighth grade. He testified he was beaten at Whitehall and ran away on several occasions in an attempt to find his family. He recalled that, at 12 years of age, he was accused of attempting to molest a housemother and was sent to a mental hospital for more than a year, where he received psychotropic medication, hydrotherapy, and electroshock treatment. Defendant also described his criminal history, which encompassed being kept in custody for all but approximately two and one-half years of his adult life. During his time in prison, he earned a high school equivalency degree, was trained as a dental assistant, and was an excellent worker.

Four individuals who resided at Whitehall contemporaneously with the Foster children described their experiences. Samuel Zanderholm testified that children were not allowed to visit their siblings on a daily basis but were permitted to interact when they encountered each other during free time. He recalled that some children were spanked with a paddle, and confirmed that

"a lot of people" ran away. He was unaware of any sexual abuse. Esther Zanderholm testified that life at Whitehall was very regimented, and recalled that lilac branches were used to whip children. Darlene Cummings testified that Whitehall was a very controlled environment in which residents had no freedom, making it difficult for residents to adjust to life outside of Whitehall. She stated she was hit in the mouth once and her brother was hit with a rubber hose once, but she was unaware of any sexual abuse. She stated that children who returned to Whitehall from the mental institution "acted kind of strange and they even looked different," and she confirmed that it "was pretty commonly known . . . that if you went to the mental institution, you got the shock treatment." Daryld Schlereth confirmed that spankings and blows to the face were administered by staff at Whitehall. He testified that most of the teachers and houseparents were "pretty decent," but he ran away four times because he grew tired of the rules. He stated he had heard children discuss electroshock treatment when they returned from the mental hospital, but he never heard about treatment with ice water. When asked whether he saw defendant get hit, he stated that he thought defendant had been "worked . . . over a few times like all of us." He testified that defendant bullied other children, and that defendant became more violent and rebellious after returning from the mental hospital.

Dr. Edward Fischer, a psychologist, administered various tests to defendant and conducted interviews concerning his background. He testified that defendant has an IQ of 112, and no indication of organic brain damage. He concluded defendant has an "antisocial personality" disorder, and testified that individuals with this disorder exhibit a low tolerance for frustration and engage in conflict with authority. According to Fischer, such individuals "can't change the way they behave. [¶] Their emotional responses were conditioned by the earlier emotional scenarios that were acted out with their family." He described defendant's family as extremely dysfunctional, with "substantial abuse, incest, thievery." Documents reviewed by Fischer disclose that when defendant was institutionalized in Nebraska, questions were raised concerning whether he could adjust to life outside an institution. According to Fischer, defendant could function well in a highly structured environment such as a prison.

James Park, a former associate prison warden at San Quentin State Prison, addressed the issue of prison security. He stated that an individual sentenced to life imprisonment without the possibility of parole would be placed in the level-four security classification, which is the highest security level for the general prison population. He added that even if such a prisoner eventually is reclassified for level-three confinement, he or she will be guarded by the same level of perimeter security and gun coverage as a level-four prisoner. He stated that although level-four prisoners may work, go to the exercise yard, and participate in programs such as Alcoholics Anonymous, their

schedules are very regimented. He testified that defendant was an excellent worker in prison and, in Park's opinion, would "pay his way" in prison and "contribute to the safe, good operation of a prison."

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Physical restraint of defendant at trial*

At trial, defendant was restrained by a stun belt and leg restraints. He contends these restraints violated his rights of confrontation, due process, a fair trial, the assistance of counsel, and a reliable determination of the issues of guilt and penalty, as well as the presumption of innocence, under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The prosecutor moved for an order permitting the use of physical restraints upon defendant, based upon his escape from Idaho State Penitentiary in 1973 and his flight from Richard Nester after defendant attacked Cindy M. At a hearing on the motion, defense counsel stated that the defense did not object to an electronic security belt, but did oppose leg restraints. The trial court concluded that defendant "has, over the years, exhibited violence and also a firm commitment to escape when he decided to do that." The court further concluded that "this is a case in which we should not just rely upon the belt, because, although the belt is handled by extremely competent people, you never know what's going to happen."

■ "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322]; see also *Deck v. Missouri* (2005) 544 U.S. 622, 629 [161 L.Ed.2d 953, 125 S.Ct. 2007] ["the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial"]; *People v. Stevens* (2009) 47 Cal.4th 625, 632–633 [101 Cal.Rptr.3d 14, 218 P.3d 272] [reviewing principles concerning physical restraints]; *People v. Mar* (2002) 28 Cal.4th 1201 [124 Cal.Rptr.2d 161, 52 P.3d 95] [addressing factors to be considered in evaluating whether a stun belt should be used].)

Defendant did not object to being restrained or to the use of a stun belt as a restraint. Therefore, he has forfeited his claim to the extent he contends he should not have been restrained at all, or that the stun belt was an inappropriate form of restraint. (See *People v. Ward* (2005) 36 Cal.4th 186, 206 [30

Cal.Rptr.3d 464, 114 P.3d 717]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [15 Cal.Rptr.2d 382, 842 P.2d 1142] (*Tuilaepa I*), affd. *sub nom. Tuilaepa v. California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630] (*Tuilaepa II*).)

We need not decide whether the trial court abused its discretion in concluding that defendant also should be constrained by leg restraints, because there is no evidence suggesting that any juror observed the use of these restraints.[8] "We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury. [Citations.]" (*Tuilaepa I, supra,* 4 Cal.4th at pp. 583–584; see also *People v. Anderson* (2001) 25 Cal.4th 543, 596 [106 Cal.Rptr.2d 575, 22 P.3d 347].)[9]

### 2. *Voir dire of prospective jurors*

Defendant claims the trial court's examination of the prospective jurors was inadequate to reveal bias, and that the jury included jurors who were biased against defendant. He contends the trial court's examination violated Code of Civil Procedure section 223, and resulted in a denial of his rights to a fair trial, a fair and impartial jury, due process of law, and reliable guilt and penalty determinations under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, section 16 of the California Constitution.

 In 1996, when defendant's case was tried, Code of Civil Procedure former section 223 specified that "the court shall conduct the examination of prospective jurors," and also provided that the court had discretion to permit

---

[8] Defendant asserted at oral argument that the trial court acknowledged the jury would see the restraints. On the contrary, the trial court questioned defense counsel's assertion that the restraints would be visible to the jury, inquiring: "What makes you think that?" Defense counsel responded: "[D]uring the course of the length of this trial, the jury obviously is going to see that [defendant] is in custody. In fact, our questionnaire addresses that issue." The court then stated, "They are going to know." Defense counsel echoed, "They are going to know," and the trial court added, "Even if it wasn't addressed." Thus, the trial court's comment acknowledged that the jury would be aware defendant was in custody, not that the jury would observe the restraints. In any event, as noted, there is no evidence suggesting the jury saw the restraints.

[9] Respondent contends defendant forfeited his constitutional claims by failing to assert them in the trial court. When "new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution," a "defendant's new constitutional arguments are not forfeited on appeal." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) Defendant's challenge on appeal is merely a constitutional "gloss" upon an objection raised below, and therefore is not forfeited.

the parties to engage in further inquiry.[10] In the present case, the examination of prospective jurors initially was conducted through a questionnaire. The trial court rejected defendant's request that the questionnaire set forth six categories of views concerning the death penalty, rather than the five categories identified in the prosecution's proposed questionnaire, and also rejected defendant's objections to the manner in which the prosecution had defined these categories. The court informed defendant, however, that "during the *Hovey* voir dire, you will have great latitude in phrasing the questions your way using your chart [of classifications] and saying I think this is a better way, let's explore it with you." (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301] [voir dire that addresses issues related to the death penalty "should be done individually and in sequestration"]; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 973, fn. 5 [108 Cal.Rptr.2d 291, 25 P.3d 519] [Code Civ. Proc., § 223 abrogates *Hovey's* requirement of individual and sequestered voir dire].) The trial court confirmed with defense counsel that the prosecution's questionnaire addressed all of the issues that the defense wanted addressed and was not phrased in a manner that was argumentative or that would require the jurors to prejudge the evidence.[11] The court also reiterated that "over and above the questionnaire, counsel is going to have extremely wide latitude in terms of the *Hovey* voir dire and in terms of the voir dire of the jurors [once] they are seated as a group in the box . . . ."

Before distributing the questionnaire, the trial court read to the prospective jurors the charges and allegations against defendant, informed them that defendant had pleaded not guilty, and explained that the People bore the burden of proving those charges and allegations beyond a reasonable doubt. After considering claims of hardship, the court explained that if the jury found defendant guilty of murder in the first degree and found a special circumstance allegation to be true, there would be a second phase of the trial during which the jurors would be presented with evidence concerning aggravating and mitigating circumstances and would be asked to decide

---

[10] Code of Civil Procedure former section 223 provided: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement examination by such further inquiry as it deems proper . . . . [¶] . . . [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

[11] The jury questionnaire was 29 pages in length and posed 137 questions, some with multiple subparts. Defendant concedes on appeal that the questionnaire addressed most of the areas of inquiry specified in section 8.5 of the California Standards of Judicial Administration, and he does not contend the questionnaire was inadequate. (See *People v. Holt* (1997) 15 Cal.4th 619, 661 [63 Cal.Rptr.2d 782, 937 P.2d 213] [directing, subsequent to the trial in the present matter, that trial courts "should closely follow the language and formulae for voir dire recommended by the Judicial Council in the Standards [of Judicial Administration]"].)

between the punishments of death and life imprisonment without the possibility of parole. The court read to the prospective jurors the description of aggravating and mitigating factors set forth in section 190.3, and stated that "we need to select people who can fairly choose one punishment over the other" rather than individuals who would be committed in advance to selecting one of the two punishments over the other. The court explained that all of the prospective jurors would receive a questionnaire, and that none of them should "hold back with regard to any feelings you might have on any issue that is raised."

After the prospective jurors returned the questionnaires, counsel were afforded time to review the answers and then were allowed to question the jurors. The trial court did not pose any oral questions to the prospective jurors, nor did it limit the parties' questioning of them.

Defendant did not object to the manner in which voir dire was conducted, nor did he indicate he believed the trial court should undertake examination in addition to the questions posed by the questionnaire and the unlimited questioning afforded defendant and the prosecution. Defendant therefore has forfeited his claim that the voir dire was inadequate. (See *People v. Taylor* (2010) 48 Cal.4th 574, 608 [108 Cal.Rptr.3d 87, 229 P.3d 12] [the defendant forfeited his claim of inadequate voir dire "because his counsel failed to suggest followup questions . . . or otherwise complain about the adequacy of the trial court's voir dire"]; *People v. Rogers* (2009) 46 Cal.4th 1136, 1149 [95 Cal.Rptr.3d 652, 209 P.3d 977] (*Rogers*) ["Defendant neither objected to the questionnaire used, nor proposed any modifications of additional questionnaire inquiries. He therefore has forfeited any claim that the questionnaire and its contents were inadequate to root out any pro-death-penalty bias on the part of the prospective jurors."]; *People v. Robinson* (2005) 37 Cal.4th 592, 620 [36 Cal.Rptr.3d 760, 124 P.3d 363] ["If counsel had believed that further inquiry was necessary . . . , he could have submitted additional questionnaire inquiries or suggested additional oral questions. . . . [D]efense counsel's failure to do so forfeits the claim on appeal."].)

Defendant's claim also fails on the merits. The trial court examined the prospective jurors through the comprehensive questionnaire (see Code Civ. Proc., former § 223 ["the court shall conduct the examination of prospective jurors"]) and afforded defendant unlimited voir dire. As in *Rogers*, "[t]hese procedures 'provided an adequate basis upon which the parties were able to exercise challenges for cause as well as peremptory challenges.' (*People v. Robinson, supra*, 37 Cal.4th at p. 618 [addressing a similar questionnaire with followup trial court questioning]; see *People v. Carter* [(2005)] 36 Cal.4th [1215,] 1251 [32 Cal.Rptr.3d 838, 117 P.3d 544] [voir dire found more than adequate when written juror questionnaires were used, and each side was

given very limited time to voir dire but also given the opportunity to request additional court-conducted followup questions].)" (*Rogers, supra,* 46 Cal.4th at pp. 1150–1151.) In these circumstances, the trial court had no duty to compel counsel to explore more thoroughly the views of the prospective jurors, or to engage itself in additional questioning. (See *People v. Stewart* (2004) 33 Cal.4th 425, 458 [15 Cal.Rptr.3d 656, 93 P.3d 271] [additional areas of inquiry might have assisted defense counsel in exercising challenges, but such inquiry was not constitutionally compelled]; see also *Ristaino v. Ross* (1976) 424 U.S. 589, 594–595 [47 L.Ed.2d 258, 96 S.Ct. 1017] ["*Voir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' [Citations.] This is so because the 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of that trial judge.' "].)

■ Finally, although defendant did not challenge any of the seated jurors for cause and did not exhaust the peremptory challenges available to him, he contends the verdicts must be set aside because six jurors were biased against him. (See *Johnson v. Armontrout* (8th Cir. 1992) 961 F.2d 748, 754 ["When a defendant fails to object to the qualifications of a juror, he is without remedy only if he fails to prove actual bias."].) "Actual bias" is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); see *People v. Hillhouse* (2002) 27 Cal.4th 469, 488 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

Our review of the record reflects that none of the six jurors challenged by defendant exhibited actual bias against him. Although Juror No. 1's questionnaire stated she was unwilling to weigh and consider all aggravating and mitigating factors, further questioning revealed that she was confused by the questionnaire's inquiry, and that she would weigh and consider such factors. Although Juror No. 3 favored the death penalty, indicated that his background in law enforcement would make it difficult to be fair and impartial, expressed skepticism concerning psychological evidence, and stated he would "have to be really convinced" of the mitigating factors, he also responded that he would not always vote for the punishment of death, would weigh and consider the aggravating and mitigating factors, could be a fair and impartial juror in the present case, and would listen to both sides. Contrary to defendant's assertion, Juror No. 7 did not state he would vote for the punishment of death if defendant "did the crime." Rather, he answered "yes" in response to the question "if you were convinced . . . that he . . . did the crime and deserves the death penalty, you could vote for the death penalty?" Juror No. 10 stated she "would lean towards the death penalty probably," but would not always vote for death and would consider aggravating and mitigating factors. She agreed with defense counsel's characterization of her

position as "very pro death as far as the death penalty." When the prosecutor inquired whether she "could listen to both sides and be fair and make a proper decision," she responded, "I think so, as much as anybody can. I'm not sure. It would be very difficult, but I think that I can." Juror No. 11 indicated during voir dire that she would not consider "a person's life story" or psychological evidence, and then stated that she would "have to hear it or see it." When defense counsel explained that he was referring to "any evidence you hear, [that] we ask you to weigh and consider," she responded, "Oh, yeah, that's exactly what I would do." Finally, Juror No. 12 indicated on his questionnaire that he neither favored nor opposed the death penalty, and was willing to weigh and consider all of the aggravating and mitigating factors. Defendant quotes Juror No. 12's statement that "to kill another person should warrant the death penalty . . . ," but defendant omits the last three words of the statement—"based on circumstances." Defendant also points to Juror No. 12's statement, in response to the question whether he had discussed the death penalty with his spouse or friends, that "senseless killing warrants the death penalty," and the juror's reference to prisoners who have been sentenced to life imprisonment without the possibility of parole as "being catered to for a crime committed." None of these six jurors' statements reflect actual bias against defendant.

### B. *Guilt Phase Issues*

#### 1. *Admission of evidence of prior crimes*

Defendant contends the trial court's admission of evidence of his prior crimes violated Evidence Code sections 1101 and 352, depriving him of his rights to a fair trial, to present a defense, and to due process of law, and rendered the guilt and penalty phase determinations unreliable, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The People moved in limine to admit the testimony of Johnnie C. and Cindy M. concerning defendant's prior robberies and assaults. This evidence was offered to prove identity, a common plan, and intent. (Evid. Code, § 1101, subd. (b).) To establish that the prior crimes were admissible, the People emphasized the number of similarities between each of them, respectively, and the charged offenses that are the subject of the present automatic appeal. With respect to the attack on Cindy M. and the charged offenses involving Gail Johnson, the People stated that (1) the two incidents occurred within three-quarters of a mile of each other, in a relatively rural town area, Apple Valley, (2) both occurred between noon and 1:30 p.m., (3) both occurred in an office, (4) both female victims were working alone, (5) defendant had visited each site before the crimes occurred, (6) during his earlier visits to

both sites, defendant provided a false story with respect to the purpose of his visit, (7) the contents of both victims' purses were emptied onto the floor, (8) the victims' purses were placed on the floor, (9) the victims were moved to a back area, (10) Cindy M. was told to disrobe, and one of Gail Johnson's shoes was found on top of the desk, (11) both victims resisted and were stabbed, and (12) each attack occurred shortly after defendant was released on parole.

The People also observed that, although no knife was seen or used in the attack on Johnnie C. in Boise, Idaho, that attack shared many of the 12 foregoing similarities between the attack on Cindy M. and the present offenses.

Defense counsel argued that the two prior attacks were not sufficiently similar to the charged crimes to be relevant. He challenged the view that the Cindy M. incident and the charged offenses occurred in an area of a rural town, stating that the population of "[t]he metropolitan area of Apple Valley, Victorville, Hesperia and other adjacent and contiguous communities is considerably in excess of 100,000." With respect to the time of day, the office setting, and the presence of only the female victim, counsel claimed it would be necessary to know the number of similar crimes committed in the area in order to determine the uniqueness of these characteristics. He also asserted that defendant did not present a false story at the church—his mother was ill, and he was concerned about her. With respect to the presence of a purse and its spilled contents on the floor, counsel stated that "[t]here is only one quick method to find items contained in a purse." He also argued that because the prior crimes involved sexual assaults, the evidence was unduly inflammatory, and jurors would be tempted to convict him of the charged crimes if they believed he should have served more time for the prior crimes.

The trial court concluded the crimes exhibited common features that were sufficiently distinctive to support the inference that the same person committed all three crimes pursuant to a common scheme and with the same intent, and that the probative value of the evidence outweighed the risk of undue prejudice. The court instructed the jury, pursuant to CALJIC No. 2.50, that "[s]uch evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged or the identity of the person who committed the crime, if any, of which the defendant is accused."

█ "Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.) Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

█ "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).) "A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [E]vidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations.' " (*Ibid.*) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. . . . [T]he uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Id.* at p. 403.) " ' "The highly unusual and distinctive nature of both the charged and [uncharged] offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense." [Citation.]' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1003 [81 Cal.Rptr.3d 299, 189 P.3d 300] (*Hovarter*).)

█ If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, common plan, or identity, the trial court then must consider whether the probative value of the evidence "is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Ewoldt, supra,* 7 Cal.4th at p. 404.) "Rulings made under [Evidence Code sections 1101 and 352] are reviewed for an abuse of discretion. [Citation.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1130 [81 Cal.Rptr.3d 614, 189 P.3d 880].) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion

in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*Hovarter, supra*, 44 Cal.4th at p. 1004.)

As we explain below, the trial court did not abuse its discretion in concluding that the evidence was relevant to prove defendant's intent and plan, or in concluding that its probative value with respect to these two issues was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. In addition, because evidence of prior conduct may be admitted to prove a defendant's intent and plan, regardless of whether it also is relevant to prove the defendant's identity as the perpetrator, we need not decide whether the evidence was admissible to prove defendant's identity. Assuming, without deciding, that the jury should not have been instructed that it could consider the evidence to establish defendant's identity as the perpetrator, any error in this jury instruction was harmless. Finally, neither the admission of the evidence, nor the instruction that the evidence was relevant to establish defendant's identity as the perpetrator, violated defendant's rights to a fair trial, to present a defense, to due process of law, and to reliable determinations of the issues of guilt and penalty.

We begin our analysis by noting the similarity between the prior crimes and the charged offenses. The evidence established defendant's pattern of visiting an office in the middle of the day, determining that a woman was alone in the office, returning in the middle of the day, moving the woman to a more remote area of the premises, demanding the woman's money and any other cash available on the premises, and violently attacking her when she resisted. If the jury found that defendant was the perpetrator of the charged crimes, the pattern of his prior crimes strongly suggested that at the time he returned to the church two days after his initial visit in the middle of a weekday, when there was only one vehicle in the church's parking lot and after learning that the minister was a woman, he entered the church with the same intent as reflected in his prior crimes—to determine that a woman was alone, to move her to a more private area of the premises, and to rob and assault her, pummeling her with his fists and stabbing her with his knife if necessary to subdue her. These common features manifest the same general plan, and therefore support a finding that defendant acted in accordance with that plan.

Defendant asserts that any probative value of the prior-crimes evidence was minimized by differences between the charged crimes and the prior crimes. First, he contends, the prior crimes were "fundamentally dissimilar to the charged crimes in that the former crimes were committed for the purpose of sexual gratification whereas the current crimes had no such hallmarks." We

disagree. The three incidents were quite similar, as far as they all progressed. Each involved the robbery of a woman alone in an office, and each involved a violent confrontation. The first confrontation ended when Johnnie C. relented in the face of defendant's violent attack, and the second ended when Cindy M. escaped after defendant assaulted and threatened to kill her. That the violent confrontation in the current case ended in death rather than a sexual assault does not detract significantly from the pattern reflected in the three incidents. For these same reasons, we also reject the related contention that it was "purely coincidental" that the victims were women.

Second, defendant, noting he was identified by the victims of the prior crimes, asserts that he made no effort before or during the prior crimes to conceal his identity from the victims. In contrast, "[i]n the current case, the perpetrator was not personally identified by any witness, and considerable efforts were made after the killing to preclude the possibility of identification." In connection with the crimes committed against Johnnie C., however, defendant marked over his name in the studio appointment book. In addition, defendant's violent assault upon Cindy M. suggests that he would have killed her in order to avoid detection, had she not escaped. His flight from Nester also reflected the measures he would take to avoid apprehension. Finally, to the extent the evidence reflects increasing efforts to avoid apprehension and conviction, such efforts reasonably might be expected from a person who repeatedly has been apprehended for his crimes.

Third, defendant asserts that the passage of time between the incidents reduced the probative value of the evidence. The passage of time is explained, however, by defendant's incarceration for major portions of the periods between the offenses. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1287 [96 Cal.Rptr.3d 512, 210 P.3d 1119] (*Lewis*) [noting that the defendant had been incarcerated much of the time between the prior misconduct and the charged crimes].)

Our conclusion that defendant's prior crimes were relevant to prove that defendant had the same intent and plan when he returned to the church does not end our inquiry. "[T]o be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citations.]' [Citation.] We thus proceed to examine whether the probative value of the evidence of defendant's uncharged offenses is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Ewoldt, supra*, 7 Cal.4th at p. 404.)

As reflected in our analysis of the similarity of the three crimes, the tendency of the prior offenses to establish defendant's intent and the general

plan of his actions in the church is strong. If, as established by the evidence, defendant—after learning two days earlier that the minister was a woman—returned to the church in the middle of a weekday when there was only one vehicle in the parking lot, moved the victim from the church office to the minister's personal office, and robbed and assaulted her, his prior crimes provided persuasive proof that when he returned to the church he did so with the intent to rob and assault any woman he found alone, demanding money from the victim, assaulting her, and killing her when she resisted. In addition, the evidence is not merely cumulative of other evidence concerning defendant's intent and the actions he took after entering the church, because the balance of the evidence does not render his intent and actions beyond dispute. (See *Ewoldt, supra*, 7 Cal.4th at p. 406 ["if it is beyond dispute that the alleged crime occurred," evidence of uncharged conduct to demonstrate a common design or plan "would be merely cumulative and the prejudicial effect of the evidence of uncharged acts would outweigh its probative value"].)

"Evidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual" ' [citation] or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors" ' [citation]." (*People v. Cowan* (2010) 50 Cal.4th 401, 475 [113 Cal.Rptr.3d 850, 236 P.3d 1074].) With respect to the risk of undue prejudice, defendant observes that evidence of other crimes is "inherently prejudicial." (See *Ewoldt, supra*, 7 Cal.4th at p. 404.) "As Wigmore notes, admission of this evidence produces an 'overstrong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts.' [Citation.] It breeds a 'tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offences . . . .' [Citation.] Moreover, 'the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor.' [Citation.]" (*People v. Thompson* (1980) 27 Cal.3d 303, 317 [165 Cal.Rptr. 289, 611 P.2d 883], fn. omitted.) Due to these inherent risks, "uncharged offenses are admissible only if they have *substantial* probative value." (*Id.* at p. 318, original italics; see *Ewoldt, supra*, at p. 404.) For the reasons set forth above, the evidence of defendant's prior crimes has substantial probative value with respect to the issues of intent and a common plan. Therefore, the inherent risks did not preclude the admission of this evidence.

Defendant identifies as an additional risk of undue prejudice the circumstance that he had been sentenced to lengthy prison terms for the prior crimes, but had been released from prison. He asserts that no jury would acquit him in light of his prior record. Defendant served significant prison terms for the prior offenses, however—almost 10 years in Idaho State Penitentiary, and seven years in California. (See *Lewis, supra*, 46 Cal.4th at

p. 1287 ["Because defendant was convicted of the prior rape and sentenced to prison, 'the jury would not be tempted to convict [him] simply to punish him for the other offenses . . . .' "].) We perceive minimal if any risk that the jury would conclude he was not the perpetrator of the charged crimes, but would convict him based upon the view that 17 years in prison for his prior crimes was inadequate punishment.

Finally, defendant characterizes his prior crimes as "highly inflammatory and prejudicial." Although the prior crimes were violent and sexual, they were less inflammatory than the evidence in the present case, in which defendant repeatedly stabbed the victim as she lay on the floor. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 18–19 [45 Cal.Rptr.3d 407, 137 P.3d 229] [in evaluating whether the probative value of an uncharged crime was outweighed by its potential for prejudice, the court noted that the uncharged incident involved a very serious assault, but the charged incident was a homicide].) In addition, as in *Demetrulias*, the jury was instructed not to consider the evidence to prove that defendant was a person of bad character, thereby "minimizing the potential for improper use." (*Id.* at p. 19.)

In sum, we conclude the trial court did not abuse its discretion in determining that the evidence reflected similarities between the prior crimes and the charged offenses sufficient for the evidence to be relevant to prove defendant's intent and common plan in committing the current offenses. We also uphold the trial court's exercise of discretion in determining that the probative value of this evidence was not outweighed by the risk of undue prejudice.

■ Defendant contends, however, that the evidence could not be admitted for a purpose other than identity if the identity of the perpetrator was in dispute. We have rejected this argument. "As we recently observed in *Alcala* [*v. Superior Court* (2008)] 43 Cal.4th 1205 [78 Cal.Rptr.3d 272, 185 P.3d 708], a fact finder properly may consider admissible 'other crimes' evidence to prove intent, so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes [citation], and further (2) the threshold standard articulated in *Ewoldt* can be satisfied—that is, 'the factual similarities among the charges tend to demonstrate that in each instance the perpetrator harbored' the requisite intent. [Citation.] There is no requirement that it must be conceded, or a court must be able to assume, that the defendant was the perpetrator in both sets of offenses." (*People v. Soper* (2009) 45 Cal.4th 759, 778 [89 Cal.Rptr.3d 188, 200 P.3d 816].)

As noted above, the trial court instructed the jury that the evidence of defendant's prior crimes also could be considered with respect to the issue of

the identity of the perpetrator.[12] We need not decide whether the prior crimes were sufficiently similar to the charged offenses to be relevant to the issue of identity, because any error in the court's instruction was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].) As noted above, the evidence was *admissible*, regardless of whether it was relevant to the issue of identity. Thus, the jury would have heard this evidence even if the trial court had not admitted it to establish defendant's identity as the perpetrator. In addition, as summarized below, there is overwhelming evidence establishing that defendant was, in fact, the perpetrator of the charged crimes. Finally, the prosecutor, in his arguments to the jury, stated that the evidence of defendant's prior crimes was insufficient to establish defendant's identity as the perpetrator. Therefore, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the reference in the jury instruction to proof of identity.

Blood found at the crime scene was consistent with defendant's blood, and the DNA profile would occur in only one in every 24 million Caucasian individuals.[13] Even when the defense expert expanded the interval of DNA lengths considered to be matches and applied the "product rule" to a database that included additional ethnic groups, the frequency of defendant's DNA was determined to be only one in 3.6 million persons. Also, the defense expert did not challenge Stockwell's conclusion that the proteins present in defendant's blood and in blood found at the crime scene would appear in only one in every 42,600 Caucasians. Although the defense expert rejected the validity of the product rule, he also testified that in the 100 cases in which he had

---

[12] The trial court instructed the jury, pursuant to CALJIC No. 2.50, that the evidence of other crimes could be considered "only for the limited purpose of determining if it tends to show: [¶] A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged or the identity of the person who committed the crime, if any, of which the defendant is accused."

[13] Defendant asserts that "[t]he blood evidence was suspect by virtue of possible contamination during collection and improper procedures." Although Stockwell testified that much of the blood was covered with white substances that rendered the tests on such stains inconclusive, there was no evidence establishing that the blood samples for which results were obtained were contaminated. Defendant also cites the defense expert's opinion that Cellmark Diagnostics should have conducted additional independent proficiency testing rather than internal proficiency testing. The record establishes, however, that bloodstains were preserved for testing by the defense, and no evidence was presented suggesting that Cellmark's testing of the stains in the present case was not proficient. On the contrary, the defense expert employed Cellmark's test results as the basis for his own calculations.

testified, *all* of the approximately 12 laboratories involved had employed the product rule rather than his preferred "counting method."

In addition to the blood evidence, numerous other facts established defendant's identity as the perpetrator: (1) items stolen from the victim were found in the same mine shaft in which defendant disposed of "junk," (2) a pair of jeans of the same brand and size as those worn by defendant when he was arrested, with the knee area soaked with blood consistent with the victim's blood, was found in the same mine shaft, (3) the blood on a piece of tissue paper that was found in the mine shaft, and appeared to have been held by a bleeding hand, was consistent with defendant's blood, (4) the cut on defendant's hand was consistent with the type of injury a person would sustain if his or her hand slipped while stabbing with a knife, (5) defendant had visited the church only two days prior to the charged offenses, (6) the church was a 15- to 20-minute walk from the Lucky store, where defendant parted company with his stepfather approximately 45 minutes before the crimes were committed, (7) the victim's vehicle was abandoned at the same Lucky store, and (8) on the day in question, defendant became separated from his stepfather, in contrast to their usual routine of collecting recyclable materials together.

Finally, although defendant denied he was the perpetrator, his testimony tended to establish he was not being truthful. Not only did his testimony conflict with the testimony of Reverend Plate and Nina Pittsford regarding his statements and activities at the church on Saturday, but he repeatedly was impeached with statements he made to interrogating officers following his arrest.[14]

Not only was the evidence of defendant's identity overwhelming, but the arguments of defense counsel *and* the prosecutor informed the jurors that they should not rely upon defendant's prior crimes in determining the identity of the perpetrator of the charged offenses. Defense counsel asserted that the evidence of defendant's prior crimes was of no probative value with respect to defendant's identity, and the prosecutor stated to the jury that "just the fact

---

[14] In addition to the conflicting statements made by defendant regarding his claimed presence in the minister's office two days before the crime was committed (see *ante,* fn. 6 and accompanying text), defendant made inconsistent statements concerning his route to the church on Saturday. He testified at trial that he traveled to the church by walking from his residence to the church, but he told investigators he had walked there from the Lucky store. In addition, defendant testified he went to the CC Market *on Monday* to purchase a carton of cigarettes, and generally purchased a carton every 10 to 12 days. He told investigators that he had bought a carton of cigarettes *on Saturday*. When asked at trial why, if he bought a carton of cigarettes on Saturday, he was buying another carton on Monday, he responded, "I have no idea." Not only did these inconsistencies draw into question his veracity, they also suggested that he had contrived his claim of using the minister's telephone on Saturday in order to explain the presence of any of his fingerprints on the telephone found on the floor at the crime scene, and that he was conflating the facts of *two* visits to the church.

that he commits the crime, these kind of crimes in this particular way, well, that of course doesn't mean he did this one. If that's all the evidence we had, we wouldn't be here, correct? But that isn't all the evidence that we have." The prosecutor then reviewed for the jury the extensive evidence of defendant's identity as the perpetrator.

■ Defendant asserts that the admission of the evidence in question violated his federal constitutional rights, but he does not specifically address the prejudice, if any, resulting from the jury instruction. First, because the evidence was relevant to prove a fact of consequence, its admission did not violate defendant's due process rights. (See *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384 ["Because the evidence . . . makes a fact of consequence . . . more probable, its admission was not in violation of the historically grounded rule against the use of 'other acts' evidence to prove character."].) Second, any error in the instruction's reference to the evidence as relevant to prove defendant's identity as the perpetrator would not constitute a violation of defendant's due process rights, because the instruction did not "infect[] the entire trial." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475] ["The only question for [a federal court] is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' "].) "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole *and the trial record.*" (*Ibid.*, italics added.) The overwhelming evidence of identity, and the arguments of counsel, which focused the jury upon this overwhelming evidence and advised jurors not to base a finding of identity upon defendant's prior crimes, lead us to conclude that the instruction did not corrupt the factfinding process. On this record, the jury instruction's reference to evidence of defendant's identity did not affect defendant's federal constitutional rights to a fair trial, to present a defense, to due process of law, and to reliable determinations of the issues of guilt and penalty.

In a related contention, defendant asserts that even if Cindy M.'s testimony was admissible, Nester's testimony concerning defendant's flight from that incident was not. The People's motion in limine represented that the prior crimes would be proved by the testimony of Johnnie C. and Cindy M., and by certified copies of the convictions. During defendant's opening statement, however, defense counsel stated that defendant would tell the jury he was not guilty of the attack upon Cindy M. Shortly after Nester began testifying, defense counsel objected, asserting that this testimony was inadmissible under Evidence Code sections 352 and 1101 and was not within the scope of the trial court's order granting the in limine motion. The prosecutor responded that Nester's testimony "is necessary to identify the defendant as Cindy [M.'s] attacker. As counsel said, if the defendant wasn't her attacker, this witness will prove that he was because he chased him down and nabbed

him." The trial court queried, "What about that?" Defense counsel responded, "His testimony is not relevant until Mrs. [M.] testifies." The court then asked whether Cindy M. would testify. The prosecutor confirmed she would, and the trial court overruled defendant's objection to Nester's testimony.

■ Defendant asserts that the trial court overruled his objection "[w]ithout discussing or ruling on the Evidence Code [section] 352 grounds." The court was not required, however, to discuss section 352 before ruling. " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352.' " (*Lewis, supra*, 46 Cal.4th 1255, 1285.) The record reflects that the trial court followed proper procedure in ruling upon defendant's objection. In ruling upon the motion in limine to admit evidence of defendant's prior crimes, the court considered both Evidence Code sections 1101 and 352. When defendant objected that Nester's testimony did not come within section 1101 or within the trial court's earlier ruling, and raised a further objection under section 352, the trial court elicited an explanation from the prosecutor concerning the purpose for which Nester's testimony was being offered, and requested a response from defense counsel. In reply, defense counsel stated simply that Nester's testimony was not relevant *until Cindy M. testified*; he did not suggest that there existed any other obstacle to the admission of Nester's testimony. Thus, it appears the trial court considered all of the relevant factors in ruling on the objection.

Defendant also asserts that the probative value of Nester's testimony was outweighed by its prejudicial effect. He notes that prison and court records established that defendant was convicted of the crimes committed against Cindy M., and that she would testify that he was the perpetrator. When the trial court requested a response to the prosecutor's rationale for admitting this evidence, however, defense counsel did not claim that the documentation of the convictions rendered the testimony cumulative. With respect to the prejudicial effect of Nester's testimony, defendant refers to "the strong likelihood that the jury would conflate the 1982 flight with guilt and the issue of penalty." Nester's testimony, however, added minimal additional prejudice to the defense beyond that emanating from Cindy M.'s testimony, and paled in comparison to the evidence of defendant's prior crimes, rendering it unlikely that Nester's testimony had any undue impact upon the jurors' consideration of the issues of guilt or penalty. Finally, the trial court instructed the jury concerning the limited purposes for which evidence related to the prior crimes could be considered, and directed that the jurors were "not

permitted to consider such evidence for any other purpose."[15] (See *People v. Yeoman* (2003) 31 Cal.4th 93, 139 [2 Cal.Rptr.3d 186, 72 P.3d 1166] (*Yeoman*) [the court presumes that jurors understand and follow instructions concerning the purposes for which particular evidence may be used].) For all of these reasons, we conclude the trial court did not abuse its discretion in determining that the probative value of Nester's testimony was not outweighed by any undue prejudicial effect of this testimony.

### 2. *Cross-examination of defendant regarding his prior crimes*

Defendant asserts the trial court misled him and induced him to waive his privilege against self-incrimination by the court's (1) agreeing that defendant could be asked only whether he had been convicted of an offense, and that defendant could not be questioned concerning the evidence underlying any such prior offense, and (2) subsequently allowing cross-examination concerning the facts of the prior similar offenses of which defendant had been convicted. Defendant contends the trial court's actions denied him his rights to a fair trial, to due process, and to reliable determinations of guilt and penalty guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The record does not support defendant's contention. Before defendant testified, the court and the parties discussed the extent to which the prosecutor would be permitted *to impeach* defendant with five prior convictions. Nothing said during the two court hearings at which the issue of impeachment was discussed related to the scope of cross-examination of defendant or to the bearing of defendant's prior crimes on the prosecutor's right to cross-examine defendant. In this context, the trial court agreed with defense counsel that only the fact of convictions, and not their details, would be admissible *for impeachment purposes*.

Subsequently, as the direct examination of defendant was nearing completion, the prosecutor noted that defendant had not been questioned concerning his two prior *similar* crimes, and offered legal authority concerning *cross-examination* related to those crimes. Defense counsel objected to cross-examination on this subject on the grounds that it would (1) exceed the scope of the direct examination, and (2) not be sufficiently relevant. He stated that

---

[15] Defendant asserts the trial court did not instruct the jury concerning the limited purposes for which Nester's testimony could be considered. The relevant limiting instruction referred to evidence "introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial, to wit: the crimes against Cindy [M.] and Johnnie [C.]" Nester's testimony, all of which related to the crimes against Cindy M., clearly was covered by this instruction.

the prosecutor had been allowed to present his "version" of the prior similar acts, and that allowing cross-examination would "only prolong the trial and lead to other issues."

The trial court concluded that when a defendant denies the charges, he or she may be cross-examined with respect to every issue related to the defendant's guilt and credibility, citing *People v. Thornton* (1974) 11 Cal.3d 738, 760 [114 Cal.Rptr. 467, 523 P.2d 267] (by denying guilt, the defendant placed the issue of his identity as the perpetrator in issue, and the prosecutor therefore could attempt to establish on cross-examination the defendant's involvement in other offenses that were admitted to prove the existence of an offender in common) and *People v. Ing* (1967) 65 Cal.2d 603, 611 [55 Cal.Rptr. 902, 422 P.2d 590] (because the defendant on direct examination denied the charged offenses, he could be cross-examined concerning collateral offenses). Defense counsel reiterated that the prosecution had proved the prior similar crimes by a preponderance of the evidence and that the defense had not refuted this evidence.

The record establishes that neither the trial court nor the parties assumed that the ruling concerning the admission of the evidence of defendant's five prior convictions for impeachment purposes also related to the scope of cross-examination concerning the evidence of defendant's two prior similar offenses. Defendant did not assert that the court already had decided the issue of the appropriate scope of cross-examination, or that the court's ruling concerning impeachment evidence had led him to believe that cross-examination concerning the two similar crimes would not be allowed. Rather, defendant argued that the prosecution had established the facts it was entitled to prove, and that cross-examination of defendant was not sufficiently relevant and was beyond the scope of his direct testimony. In addition, defendant's arguments opposing cross-examination were based upon legal principles different from his earlier arguments against admission of the details of his five prior convictions as impeachment evidence. This difference in the two arguments reflects the circumstance that the defense understood that two separate issues were involved. In sum, the trial court never ruled that the prosecutor could not cross-examine defendant concerning his prior similar offenses, and there is nothing to suggest that defense counsel believed the trial court had precluded such cross-examination.[16]

---

[16] The record also reflects that defendant had decided to testify *before* there was any discussion of the allowable scope of impeachment or cross-examination. During his opening statement at the guilt phase, defense counsel stated that defendant, "when he takes the stand, will admit that he was guilty in Idaho [of attacking Johnnie C.] and . . . will tell you . . . he's not guilty of that 1982 offense" against Cindy M. After Dr. Mueller testified for the defense at

### 3. *Third party contacts with jurors*

Defendant contends that third party contacts with jurors during the trial tainted the jury, resulting in a presumption of prejudice, thereby violating his rights to a fair trial, trial by an impartial jury, due process, and reliable guilt and penalty determinations, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

On Monday, April 1, 1996, before the cross-examination of defendant resumed at the guilt phase, the court informed counsel that Juror No. 9 had reported at 5:00 p.m. on Friday that notes had been left on the windshield of his vehicle, and that he had been somewhat concerned by the notes. The court further explained that the juror had learned that "it was his friend who was leaving him notes, and it turns out to be no big deal, but if you want to examine the juror about it, we can." Defense counsel inquired concerning the contents of the notes, and the bailiff reported that the juror "says he threw them out because they were from his buddy." Both sides favored further inquiry, and Juror No. 9 was brought into the courtroom to be questioned. He stated that "[i]t happened on Wednesday and Thursday and it turned out a friend of mine . . . saw my vehicle in the parking lot. He . . . told me at choir practice Thursday he was playing a little joke on me." The court asked, "Pretty funny?" The juror responded, "It wasn't for me at the time." The court then asked the juror about "the nature of the notes." The juror responded, "the first one said something about knowing that I had two dogs; I like country music—which I do—and then the other one said something like—said I looked up; I looked down—and I can't remember exactly. It just didn't make any sense." He confirmed that the incidents caused him concern. The court asked, "[W]as there anything in any of these notes about this trial or duties as a juror?" The juror responded, "[N]o, because like I said I went to choir practice Thursday night and he says . . . to me: Did you see the notes on your car? And he explained it to me." The court asked, "[W]ould getting those notes in any way affect your service as a juror on your decision in this case?" The juror responded, "I don't think so." The court asked whether counsel wished to inquire, and both sides stated they did not. When asked whether the juror had mentioned the incidents to any other jurors, he disclosed that he had mentioned to one juror, No. 12, receiving a note, and that this juror had seen him taking a note off of the windshield. The court admonished Juror No. 9 not to discuss the incident with the other jurors, and Juror No. 9 left the courtroom. The court then asked, "Does anybody feel we have to do anything with regard to this juror?" Defense counsel and the prosecutor each responded, "No."

the guilt phase, the court asked defense counsel "[h]ow much longer do you think, in terms of witnesses, . . . your case will take?" Defense counsel responded that defendant "will take the stand tomorrow morning."

The court asked that Juror No. 12 be brought into the courtroom, at which point the bailiff disclosed that she had asked Juror No. 9 in front of all of the jurors whether Juror No. 9 had a note with him. The prosecutor suggested the court bring the entire panel into the courtroom and inform them that the note was from a friend. The court proposed to "bring in the one first and then the whole panel. Anybody object to that procedure?" Both sides stated they did not object. The court then questioned Juror No. 12, who confirmed he had seen Juror No. 9 receive a note on his vehicle. The court informed Juror No. 12 that Juror No. 9 had been concerned about the notes prior to learning that a friend was leaving the notes, and that the notes were not related to the trial. The court inquired: "Would seeing him get notes or knowing that affect you in any way?" Juror No. 12 responded, "No." The court then asked, "That wouldn't affect our decision in this case?" Again the juror responded, "No." The court asked, "Does any counsel wish to inquire?" Both sides responded, "No." When the court instructed Juror No. 12 not to discuss the incident with the other jurors, he agreed not to do so.

The court stated it intended to make the same inquiry of the panel as a whole. The prosecutor asked that the court also order the jurors "to disregard anything about the notes, not to consider it in any way, has nothing to do with the case." The court agreed, and asked, "Anything else?" Defense counsel responded, "No." The entire panel was brought into the courtroom, and the court stated that a juror had received notes on his windshield on two successive days, and that the juror learned on Thursday that the notes were a joke his friend was playing. The court explained that the incident "had nothing to do with the trial," and inquired: "Having heard about the note or notes under the circumstances, does that cause anybody concern?" The panel responded in the negative. The court then asked, "Is there anybody who would be affected in any way by that circumstance?" Again the panel responded in the negative. The court concluded by instructing the jury "to disregard that occurrence. It was a joke arising out of a friendship and has nothing to do with the trial."

The second incident was brought to the attention of counsel on April 2, 1996, after both sides rested at the guilt phase. The court informed counsel that Juror No. 7 had overheard persons in the parking lot commenting to each other that Juror No. 7 was a juror in this case and that one would not want to be a juror in the case. The court asked, "Does anybody want to inquire?" Defense counsel asked whether Juror No. 7 had revealed the identity of the individuals, and the bailiff stated that the juror did not know who they were. The trial court again inquired whether anyone wished to question the juror. The prosecutor stated, "Might be a good idea to bring him in and ask him what happened and ask him to put it out of his mind, not let it affect him at all. It's not evidence in this case."

Juror No. 7 was brought into the courtroom, and the court questioned him concerning the incident. The juror stated that as he walked from his van to the courtroom after returning from the lunch break that day, "two people . . . were behind me. And one of the persons said there is one of the jurors on the trial," and the second person responded to the first person, "I wouldn't want to be a juror on this trial." Juror No. 7 added, "I don't know if they are in here or part of what's happened, but that's all that was said." The court asked whether he recognized the individuals, and the juror indicated he did not. The court asked the juror to look around the courtroom to see whether they were present. The juror looked, and replied "No." The court inquired, "[W]hat sort of impression did that make upon you?" The juror responded, "Didn't bother me in any way, shape, or form. It's just I was identified as one of the jurors." The court asked, "Do you think that that would bother you at all in terms of performing your functions as a juror?" Juror No. 7 responded, "No, your honor." The court asked, "Would it affect the way you view this case in any way?" He responded, "No, your honor." The court asked whether counsel wished to inquire. The prosecutor stated he did not, but asked that the juror be admonished to disregard the incident. The court then instructed Juror No. 7 "not to mention this to anybody else and any of the other jurors, . . . and to disregard whatever you may have heard." The juror responded, "Yes, your honor."

As our review of the trial court's investigation reflects, the court questioned the jurors, invited counsel to question them, and admonished them. At no time did defense counsel propose additional questions, object to any juror's continued service, or request a mistrial on the ground of juror misconduct. Therefore, defendant has forfeited his claim. (*Lewis, supra*, 46 Cal.4th at p. 1308; *People v. Stanley* (2006) 39 Cal.4th 913, 950 [47 Cal.Rptr.3d 420, 140 P.3d 736].)[17] As discussed below, the record also establishes that the claim fails on the merits.

[17] Defendant asserts he has not forfeited this claim, because defense counsel expressed concern about the notes left for Juror No. 9 and requested an inquiry, and because the court initiated an inquiry concerning Juror No. 7. These circumstances do not preserve his claim, because defense counsel thereafter expressed no dissatisfaction with the inquiry or with the jurors' continued service.

Defendant also asserts his challenge is not forfeited to the extent it involves the trial court's instruction, following its inquiry concerning the notes left for Juror No. 9, that the jury should "disregard that occurrence. It was a joke arising out of a friendship and has nothing to do with the trial." Defendant does not identify any error in this instruction, nor does he explain how the instruction affected his substantial rights. (See § 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)

Finally, defendant asserts it would have been futile to object after the court concluded that the jurors were not tainted by the incidents. This contention ignores the trial court's repeated invitations to counsel to pose questions or identify any concerns, and defense counsel's silence in the face of that offer.

" 'In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish . . . that such contact with the juror was harmless to the defendant. [Citations.]' (*Remmer v. United States* (1954) 347 U.S. 227, 229 [98 L.Ed. 654, 74 S.Ct. 450].)" (*Lewis, supra,* 46 Cal.4th at p. 1309; see *In re Hamilton* (1999) 20 Cal.4th 273, 294–295 [84 Cal.Rptr.2d 403, 975 P.2d 600] ["A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice."].) "The presumption of prejudice ' "may be rebutted . . . by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm." [Citations.]' [Citations.]" (*Lewis,* at p. 1309.)

Defendant challenges the adequacy of the trial court's questioning of the jurors. He states that Juror No. 9 "was permitted simply to describe the contents of one note and make them appear simply as jokes, not threats as he had previously stated." As our review reflects, Juror No. 9 described the content of both notes to the extent he could recall their content, and explained that they caused him concern until his friend explained they were a joke. No further inquiry was necessary to evaluate the situation and the propriety of the juror's continued service. Defendant also complains that "[t]he court did not inquire whether Juror No. 12 had spoken further with Juror No. 9 about the incident or with other jurors and, if so, what may have been said." Once the court made its inquiry, the mystery concerning the notes was solved, and it was determined they were a "joke." The relevant inquiry at that point related to any impact the incident may have had upon the jurors, and it was unnecessary to determine the details of any and all conversations concerning the notes.

Finally, defendant asserts the trial court should have determined whether other jurors overheard the comments heard by Juror No. 7, whether this juror had overheard other similar comments, and whether other jurors had been involved in similar incidents. The information provided by Juror No. 7 did not give rise to any inference that another juror was present when the comments were made, or that this juror had overheard other similar comments, or that other jurors had been involved in similar incidents. In these circumstances, the trial court was not required to undertake an investigation to determine what had *not* happened. (See *Lewis, supra,* 46 Cal.4th at p. 1309, fn. 38 ["the trial court was not required to confirm in greater detail exactly what [the juror] did *not* discuss with her husband"].)

Defendant also contends that the information obtained through the court's questioning of the jurors failed to rebut the presumption of prejudice. We

disagree. The content of the notes left for Juror No. 9 was unrelated to the trial, and Juror No. 9's responses established that, although the notes were not amusing "at the time," he had learned the notes were a joke. The juror did not believe that receiving the notes would affect his service on the jury. Similarly, Juror No. 12 was informed the notes were a joke and were unrelated to the trial, and he confirmed the incident would not affect him in any way. Defendant's speculation that Juror No. 9's "concern"—from the time he received the first note on Wednesday until his friend revealed the joke on Thursday evening—might have caused him to become fearful or resentful of defendant, or that Juror No. 12 would be apprehensive or biased, was rebutted by the responses of these jurors to the court's inquiries. Nor do we believe it is reasonable to infer that this incident led Juror No. 9 and Juror No. 12 to lose their impartiality as a result of concern about community expectations. Finally, any inference that Juror No. 7's awareness that two persons walking in the court parking lot knew he was a juror, and that one of the two would not want to serve as a juror on the case, would lead him to fear community reaction to his service as a juror, was dissipated by Juror No. 7's response that the comments "[d]idn't bother me in any way, shape, or form" and would not affect his service as a juror. Our review of the record fails to disclose any substantial likelihood that any juror was biased or prejudiced against defendant as a result of these incidents.[18]

### 4. *Trespass as a lesser included offense*

Defendant contends the trial court erred in failing to instruct the jury on the court's own motion with respect to trespass as a lesser included offense of burglary, in violation of his rights to due process, a fair trial, and a reliable determination of guilt and penalty guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

"[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the ·offense charged and shown by the evidence to have been committed.' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [89 Cal.Rptr.3d 225, 200 P.3d 847]; see *Beck v. Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382].) As we recently reiterated, however, trespass is a lesser *related* offense, not a lesser *included* offense, of burglary. (*People v. Taylor, supra,* 48 Cal.4th 574, 622; *People v. Birks* (1998) 19

---

[18] As in *Lewis, supra,* 46 Cal.4th 1255, "[d]efendant cites no authority requiring different or additional analysis in connection with his contention that the failure to dismiss [these jurors] violated his right to a reliable verdict under the Eighth Amendment. (See *People v. Williams* (1997) 16 Cal.4th 635, 666 [66 Cal.Rptr.2d 573, 941 P.2d 752] ['the due process clause of the Fourteenth Amendment . . . requires the sentencing jury to be impartial to the same extent that the Sixth Amendment requires jury impartiality at the guilt phase of the trial.'].)" (*Lewis, supra,* 46 Cal.4th at p. 1309, fn. 39.)

Cal.4th 108, 136 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (*Birks*).) "[T]here is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions. [Citation.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 148 [74 Cal.Rptr.3d 454, 180 P.3d 224] (*Rundle*).) Regardless of defendant's legal and factual theories concerning how his conduct may have constituted trespass, that potential crime nonetheless remains at most a lesser offense related to (but not included in) the offense of burglary.

Defendant notes, however, that at the time his crimes were committed and his trial was held, this court agreed with various other jurisdictions that it would be "fundamentally unfair to deny the defendant the right to have the court or jury consider the 'third option' of convicting the defendant of [a lesser] related offense." (*People v. Geiger* (1984) 35 Cal.3d 510, 520 [199 Cal.Rptr. 45, 674 P.2d 1303].) This circumstance is of no assistance to defendant. In *Birks*, we overruled *Geiger* and provided that our holding generally should be applied retroactively. (*Birks, supra,* 19 Cal.4th at p. 136; see also *Rundle, supra,* 43 Cal.4th 76, 147.) As in *Birks*, the retroactive application of our holding to defendant's case "merely withdraws the procedural opportunity for conviction of a *reduced* offense not encompassed by the accusatory pleading and selected solely by the defendant," and "neither expands criminal liability nor enhances punishment for conduct previously committed." (*Birks, supra,* 19 Cal.4th at p. 136.) In any event, *Geiger* afforded a right to instructions on related offenses only if the defendant requested such instructions, and defendant did not request an instruction concerning trespass.

### 5. *Burden of proof with respect to identity*

Defendant contends that the jury instructions eliminated the prosecution's burden to prove beyond a reasonable doubt that defendant was the person who committed the charged offenses, in violation of his rights to a fair trial by jury, due process of law, and reliable determinations of guilt and penalty, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Defendant notes that the trial court's instructions concerning the charged offenses and special circumstances did not specify that the identity of the perpetrator was an element and that, on the contrary, the trial court instructed that identity was not an element of the charged offenses.[19] Defendant also notes that the court did not instruct, as set forth in CALJIC No. 2.91, that the prosecution bore the burden to prove beyond a reasonable doubt that defendant was the person who committed the charged offenses.

---

[19] The trial court instructed the jury as set forth in CALJIC 2.72: "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial. [¶] *The identity of the person*

As we explained in *People v. Frye* (1998) 18 Cal.4th 894 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*), the instruction that identity is not an element of the crime "is part of the standard instruction explaining the principles of the corpus delicti rule . . . . [¶] Under this instruction, the jury is informed that a defendant cannot be convicted of a crime unless there is proof as to each element of the offense independent of his extrajudicial confession or admission." (*Id.* at pp. 959–960.) We also observed that, although the jury was not instructed pursuant to CALJIC No. 2.91 concerning the prosecution's burden to prove the identity of the perpetrator, "the challenged instruction did not relieve the prosecution from proving that defendant committed the charged crimes." (*Frye*, at p. 960.) Finally, we concluded in *Frye* that, "[i]n light of the parties' steadfast focus on the issue of identity at trial, including the consistent position by the defense that defendant did not kill the [victims] and the extensive evidence presented by the People connecting him to the crimes, . . . there is no reasonable likelihood the jury would have understood the prosecution had no obligation to prove defendant was the person who committed the offenses." (*Ibid.*)

Defendant urges us to revisit our decision in *Frye, supra,* 18 Cal.4th 894, for two reasons. First, he asserts, "CALJIC No. 2.72 clearly and unambiguously informed the jury that identity was not an element of any charged crime and did not have to be proved." CALJIC No. 2.72 did not state, however, that identity "did not have to be proved." Rather, it instructed that elements of a crime must be proved by evidence independent of any admission made by the defendant outside of the trial, but that the perpetrator's identity, which is not an element, may be established by an admission. Contrary to defendant's assertion, the instruction's statement that "[s]uch identity . . . may be established by an admission" reflects a recognition that identity must be established.

Second, defendant asserts, the court in *Frye* erred in applying the harmless error standard. The court did not find error in that case, however, nor did it evaluate whether any error was harmless. Rather, the court considered whether there was any reasonable likelihood the jury would have misunderstood the instructions, and concluded there was not. (*Frye, supra,* 18 Cal.4th at pp. 959–960; see *People v. Maury* (2003) 30 Cal.4th 342, 443 [133 Cal.Rptr.2d 561, 68 P.3d 1] ["In assessing the instruction to determine whether the jury was adequately guided under the Eighth or Fourteenth Amendment, we look to whether it is reasonably likely the jury understood the instruction and correctly applied it."].)

---

*who is alleged to have committed a crime is not an element of the crime* nor is the degree of the crime. Such identity or degree of the crime may be established by an admission." (Italics added.)

In the present case, as in *Frye*, the parties presented extensive evidence concerning the identity of the perpetrator. Moreover, the instructions describing the possible verdicts repeatedly referred to findings that defendant was or was not guilty of the charges, and the instruction explaining the presumption of innocence and the prosecution's burden stated that "[t]his presumption [of innocence] places upon the People the burden of proving him guilty beyond a reasonable doubt." (CALJIC No. 2.90.) We conclude there is no reasonable likelihood that the jury could have understood the instructions to relieve the prosecution of the burden of proving beyond a reasonable doubt the identity of the perpetrator.

### 6. *Jury instructions concerning prior crimes*

Defendant contends the jury instructions concerning evidence of his prior crimes permitted the ultimate facts of his identity and his intent with respect to the present charges of murder, burglary, and robbery to be found by a preponderance of the evidence, in violation of his rights to due process, a fair trial by jury, and a reliable determination of guilt and penalty as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[20]

As explained below, the instructions given in the present case, taken together, properly informed the jury that (1) it could not consider the evidence of defendant's prior crimes unless it found those crimes proven by a preponderance of the evidence; (2) it could not find defendant guilty unless the prosecution proved the charged offenses beyond a reasonable doubt; and (3) if the evidence of prior crimes was necessary to prove an essential fact, the jury could not rely upon that evidence unless the prosecution proved the prior crimes beyond a reasonable doubt.

The trial court instructed the jury, pursuant to CALJIC No. 2.50, that evidence introduced for the purpose of showing that defendant committed crimes against Cindy M. and Johnnie C. could be considered "only for the limited purpose of determining if it tends to show: [¶] A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged or the identity of the person who committed the crime, if any, of which the defendant is accused." The court also instructed the jury, pursuant to CALJIC No. 2.50.1, that "such other crime or crimes purportedly committed by the defendant . . . against Cindy [M.]

---

[20] Respondent contends defendant forfeited this claim by failing to object to the jury instructions. Because defendant's claim of error would affect his substantial rights, we address it, despite his failure to object. (§§ 1259, 1469.)

and Johnnie [C.] must be proved by a preponderance of the evidence. You must not consider such evidence for any purpose unless you are satisfied that the defendant committed such other crime or crimes. [¶] The prosecution has the burden of proving these facts by a preponderance of the evidence." Finally, pursuant to CALJIC No. 2.50.2, the court explained the meaning of "preponderance of the evidence."

More generally, the trial court instructed the jury, pursuant to CALJIC No. 2.90, that "a defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt." It also instructed the jury, pursuant to CALJIC No. 2.01, that "a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish a defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond such doubt."

As we noted in *People v. Medina* (1995) 11 Cal.4th 694 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*), at the guilt phase "facts tending to prove the defendant's other crimes for purposes of establishing his criminal knowledge or intent are deemed mere 'evidentiary facts' that need not be proved beyond a reasonable doubt as long as the jury is convinced, beyond such doubt, of the truth of the 'ultimate fact' of the defendant's knowledge or intent. [Citation.]" (*Id.* at p. 763.) The defendant in *Medina* had asserted "that when 'other crimes' evidence is offered to prove such matters as intent or identity, these facts should be proved by the 'beyond reasonable doubt' standard." (*Id.* at p. 764.) As in *Medina*, we find no reason to reconsider our decisions to the contrary. (See also *People v. Davis* (2009) 46 Cal.4th 539, 615–616 [94 Cal.Rptr.3d 322, 208 P.3d 78] [rejecting a request to reconsider our rulings that CALJIC Nos. 2.50, 2.50.1, and 2.50.2 do not lower the burden of proof to less than beyond a reasonable doubt].) We also reject defendant's contention that "the jury reasonably could have believed that its findings as to certain key elemental or ultimate facts and issues might be based simply on a preponderance of the evidence." The trial court's instructions concerning the People's burden to prove defendant guilty beyond a reasonable doubt, and concerning proof by circumstantial evidence, made clear that ultimate facts must be proved beyond a reasonable doubt. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 383 [63 Cal.Rptr.2d 1, 935 P.2d

708] (*Carpenter*) [the standard instructions on reasonable doubt and circumstantial evidence "made clear the reasonable doubt standard applies to intent as well as identity"].)[21]

### 7. *Sufficiency of the evidence*

Defendant contends the evidence was insufficient to support convictions for robbery, felony murder based upon robbery, burglary, felony murder based upon burglary, and deliberate and premeditated murder, or to support special circumstance findings of murder committed in the course of a robbery or burglary. Therefore, he asserts, these convictions and special circumstance findings violate his right to due process of law under the Fourteenth Amendment to the United States Constitution and article I, section 14 of the California Constitution, and his right to a reliable determination of his guilt guaranteed by the Eighth Amendment to the United States Constitution.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' [Citation.] 'In a case, such as the present one, based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment. [Citation.]' [Citation.]" (*Lewis, supra*, 46 Cal.4th at pp. 1289–1290, fn. omitted.)

██ We first focus our analysis upon defendant's conviction for burglary. Any person who enters a building or room with the intent to commit larceny or any felony is guilty of burglary. (§ 459.) In defendant's view, the evidence reflects that the larceny was incidental to the killing, and was not

---

[21] Defendant asserts that "neither *Medina* nor *Carpenter* involved the use of prior crimes evidence to prove both basic or evidentiary facts and elemental or ultimate facts as in this case." In *Medina*, evidence of uncharged murders was admitted to link the defendant to the charged murder. (*Medina, supra*, 11 Cal.4th at p. 723.) In *Carpenter*, evidence of uncharged murders was admitted to establish the defendant's state of mind. (*Carpenter, supra*, 15 Cal.4th at p. 383.) Thus, in each of the two cited cases, the evidence was admitted to prove ultimate facts.

intended when defendant entered the church. A rational trier of fact could conclude, however, that defendant entered the church with the intent to commit larceny, based upon (1) the circumstances of the crime—within a short time after entering the building, defendant stole the victim's belongings—and (2) defendant's pattern of entering offices and violently robbing solitary women. This same evidence supports a finding that the killing was committed in the course of a burglary, and thus supports a finding of felony murder based upon the commission of a burglary, and the special circumstance of murder committed in the course of a burglary. (§§ 189, 190.2, subd. (a)(17)(G).)[22] The fact that the evidence also may support other scenarios does not render insufficient the evidence supporting the verdict. (*People v. Bolden* (2002) 29 Cal.4th 515, 553 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

We next consider defendant's conviction for robbery. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Defendant contends the evidence reflects only that the perpetrator took the victim's property *after* the victim was killed. For the reasons set forth above, however, a rational trier of fact could conclude that defendant decided, before he killed the victim, to steal her belongings, and that, in accordance with his plan or pattern in committing his prior crimes, demanded the victim's belongings before harming her. Thus, substantial evidence supports the conclusion that the victim's property was taken against her will, and that the killing was committed in the course of the robbery. Therefore, substantial evidence supports a finding of felony murder based upon the commission of a robbery, and the special circumstance of murder committed in the course of a robbery. (§§ 189, 190.2, subd. (a)(17)(A).)

Finally, defendant contends there was no substantial evidence to support the conclusion that the murder was deliberate and premeditated. As explained above, there was substantial evidence that the killing was committed in the course of a burglary and a robbery. Therefore, substantial evidence supports a finding of first degree felony murder. Because the jury unanimously found the felony-murder special circumstances to be true, it also must have agreed unanimously that defendant committed felony murder premised upon his commission of the offenses of burglary and robbery. (*People v. Hawthorne* (2009) 46 Cal.4th 67, 89–90 [92 Cal.Rptr.3d 330, 205 P.3d 245] (*Hawthorne*).)

---

[22] Defendant notes that at the time of his trial, the felony-murder charge could not be premised upon a burglary committed for the sole purpose of assaulting or killing the victim. (*People v. Wilson* (1969) 1 Cal.3d 431, 440 [82 Cal.Rptr. 494, 462 P.2d 22]; see *People v. Farley* (2009) 46 Cal.4th 1053, 1121 [96 Cal.Rptr.3d 191, 210 P.3d 361] [this court's overruling of *Wilson* does not apply retroactively].) The trial court's instruction concerning burglary identified larceny as the sole basis of the burglary charge. Thus, this case presents no issue concerning merger of the burglary and the homicide.

Therefore, we need not address the question whether substantial evidence supports the alternative theory of deliberate and premeditated murder.

In sum, substantial evidence supports all of the jury's findings.

### 8. *Asserted prosecutorial misconduct*

Defendant contends the prosecutor committed acts of misconduct that denied defendant his rights to a fair trial, an impartial jury, due process, and reliable determinations of guilt and penalty, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

"Under the federal Constitution, a prosecutor's behavior deprives a defendant of his rights 'when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' [Citations.] Conduct that falls short of that standard 'may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 370–371 [106 Cal.Rptr.3d 771, 227 P.3d 342] (*Gamache*).) "In addition, ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' [Citation.] Objection may be excused if it would have been futile or an admonition would not have cured the harm. [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 760 [95 Cal.Rptr.3d 78, 209 P.3d 1] (*Dykes*).)

#### a. *Referring to inadmissible evidence and eliciting inadmissible testimony*

Defendant asserts the prosecutor committed misconduct by discussing Richard Nester's testimony during the People's opening statement, and by introducing Nester's testimony concerning defendant's flight from the assault upon Cindy M. Defendant did not object to that aspect of the People's opening statement. In addition, he objected to the introduction of Nester's testimony only on the basis that the testimony was not relevant until Cindy M. had testified. Therefore, defendant has forfeited his present contentions. Moreover, in light of our conclusion that the trial court did not abuse its discretion in admitting this evidence, the prosecutor's reference to the evidence during his opening statement was not misconduct. Finally, because the trial court ruled that Nester's testimony was admissible, the prosecutor's introduction of this evidence did not constitute misconduct. (*Hawthorne, supra*, 46 Cal.4th 67, 94.)

Defendant asserts that the prosecutor's cross-examination of defendant with respect to his prior crimes violated the trial court's ruling concerning the

scope of cross-examination. Defendant did not object to the cross-examination on the ground of prosecutorial misconduct. Therefore, he has forfeited this claim. The claim also fails on the merits. As discussed above (pt. II.B.2.), the trial court did not rule that defendant could not be cross-examined concerning his prior crimes. In addition, the trial court overruled defendant's objections. Thus, the prosecutor's cross-examination of defendant was not misconduct.

Finally, defendant sets forth seven questions to which objections were sustained.[23] He does not explain why the trial court's rulings sustaining the objections were inadequate to abate any prejudice. (See *Dykes, supra*, 46 Cal.4th at p. 764 ["because the trial court sustained objections to the argumentative element of the prosecutor's questioning, we assume any prejudice was abated"].) He also fails to address why the prosecutor's

---

[23] First, after defendant twice noted that there was no trial in the Johnnie C. case, and that instead he had pleaded guilty, the prosecutor asked, "Are you trying to leave the impression that if you commit a crime, you just admit it?" The trial court sustained defendant's unspecified objection.

Second, in the course of questioning defendant about his escape from an Idaho prison, the prosecutor asked, "You don't like prison[,] would that be fair to state?" The trial court sustained defendant's relevancy objection.

Third, after questioning defendant about his activities after he was released from prison in 1982, the prosecutor asked, "[H]ad you gotten any insight as to why you committed those crimes that landed you in prison back in 1972?" Defendant answered, "No, I did not." Defense counsel objected and requested that the court strike the question and answer as "improper cross-examination." The trial court sustained the objection and directed that the answer be stricken.

Fourth, the prosecutor asked whether defendant did "something at your 1982 trial to try to disguise your appearance." Defendant answered, "I did not." The trial court sustained an objection of "no foundation." At a sidebar conference, the prosecutor explained that the evidence would show that defendant grew a beard before his trial in the Cindy M. matter. The trial court then concluded that the questions concerning defendant's appearance were appropriate, "since [identity] is an issue." Thus, the prosecutor's questions were not misconduct. (See *Hawthorne, supra*, 46 Cal.4th at p. 94.)

Fifth, the prosecutor asked, "So when you were released on December 12th, 1990, you had spent about 18 years in prison for the 1972 crime and the 1982 crime, is that correct?" Defendant's objection that the question was irrelevant was sustained.

Sixth, the prosecutor then asked, "during that period of time, isn't it true that you spent this time in prison all because victims had come into court and identified you as their attacker?" Defendant answered, "With the exception of the escape." Defense counsel's objection that the question called for a conclusion was sustained.

Seventh, the prosecutor asked whether, when defendant was released from prison on December 12, 1982, he was "aware of the consequences of the crime of murder." Defendant answered, "Yes." The prosecutor then asked, "You knew if you committed the crime of murder, you could get the death penalty." Defendant answered, "No, not specifically, death penalty." Defendant objected that the question oversimplified the law and brought the issue of penalty into the guilt phase. The prosecutor responded that the elements of first degree murder require that the defendant have in mind the consequences of killing. The court sustained the objection "on the grounds of 352."

questions constituted misconduct, other than to note that the trial court sustained the objections. Therefore, we decline to address these contentions. (See *People v. Catlin* (2001) 26 Cal.4th 81, 133 [109 Cal.Rptr.2d 31, 26 P.3d 357] (*Catlin*) [because defendant "fails to offer any authority or argument in support of [his] claim, . . . it is not considered here"]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182 [74 Cal.Rptr.2d 121, 954 P.2d 384] (*Barnett*) [because defendant "fails . . . to support th[e] claim with adequate argument[, we] . . . reject it as not properly raised"].)

### b. *Asserted references at the guilt phase to the issue of penalty*

Defendant asserts that at the guilt phase the prosecutor improperly referred to the issue of penalty by (1) describing defendant's prior terms of incarceration, and (2) examining defendant's parole officer concerning defendant's Idaho prison records. As explained below, defendant not only has forfeited these contentions, but they fail on the merits.

In his opening statement, the prosecutor, in describing the crimes committed by defendant against Johnnie C., noted that defendant "was sentenced to life in prison in Idaho" for those crimes, but "in Idaho at that time life in prison didn't mean life in prison." He added that defendant "did remain in prison for almost 10 years." Similarly, after describing the crimes against Cindy M., the prosecutor noted that defendant was sentenced to 13 years in prison, but "in California at that time 13 years didn't mean 13 years. A person would serve a portion of that time and then they had to be released on parole if they behaved themselves in prison."

Defendant did not object to these statements, and therefore has forfeited his claims. He contends, however, that he should not be precluded from presenting them, because "the prosecutor's comments disclose an improper pattern of prosecutorial behavior," citing *People v. Hill* (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673]. In *Hill*, defense counsel "was subjected to a constant barrage of [the prosecutor's] unethical conduct, including misstating the evidence, sarcastic and critical comments demeaning defense counsel, and propounding outright falsehoods." (*Id.* at p. 821.) In addition, by objecting, defense counsel "risk[ed] repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting [defense counsel] was an obstructionist, delaying the trial with 'meritless' objections." (*Ibid.*) No such circumstances are reflected in the record in the present case. Defendant also asserts that "[a] contemporaneous objection would only have highlighted the improper comments and have further inserted into the guilt phase improper considerations of penalty." An objection always will highlight the matter to which the objection is directed. Allowing this consequence to

overcome the requirement of an objection would negate the rule that a party must object and request an admonition in order to preserve a claim of error and enable the trial court to correct the asserted error.

Defendant's claim also fails on the merits. The prosecutor's motion in limine to admit evidence of defendant's prior crimes stated that the People would prove those crimes with testimony from the victims and "by a certified copy of the . . . conviction in each case." The certified copies of these documents reflected that defendant was sentenced to life in prison in Idaho in 1972, and to 13 years in prison in California in 1982. Because the timeline of defendant's incarceration and the dates of his release were relevant to the jury's evaluation of the probative value of the evidence of defendant's other crimes, an explanation of the actual sentences he served was appropriate. In addition, the prosecutor referred to the sentencing schemes "at that time," and did not suggest that the sentence to be imposed in the present case would not be carried out in full.

Defendant asserts that the prosecutor also introduced the issue of penalty during his examination of defendant's parole officer, Steven Slaten, by repeatedly attempting to establish that records from the State of Idaho indicated defendant had been sentenced to life in prison. Defendant's objections to the prosecutor's questions were based upon the hearsay character of the Idaho records; defendant did not object that the contents were irrelevant or that the prosecutor's questions otherwise were improper. Therefore, defendant has forfeited his present contention. The claim also fails on the merits. The trial court already had admitted the certified copy of the Idaho records reflecting defendant's conviction and sentence, and the prosecutor merely attempted to have Slaten explain the contents of that document. As noted above, the terms of defendant's prior incarcerations were relevant to an evaluation of the probative value of defendant's prior crimes, and this document was offered to establish relevant facts. Thus, the substance of the prosecutor's questions was not inappropriate.

Because the prosecutor's statements and questions were relevant to pertinent aspects of defendant's prior crimes, we reject defendant's assertion that the prosecutor's conduct was "part of an overall strategy . . . to encourage the jury improperly to consider penalty and the propriety of death in this case." We further note, however, that the jury was instructed, pursuant to CALJIC No. 17.42 and CALJIC No. 8.83.2, not to discuss or consider the subject of penalty or punishment in their deliberations concerning guilt, and that this subject must not in any way affect the jury's verdict or findings. We assume the jury followed these instructions. (See *Yeoman, supra*, 31 Cal.4th 93, 139.)

c. *Accusing defendant of guilt of uncharged crimes*

Defendant contends the prosecutor argued that defendant also was guilty of uncharged sex crimes against the victim. He bases this contention upon the prosecutor's comparison, in his opening statement, of defendant's prior crimes to the charged offenses. After describing the prior crimes, the prosecutor characterized the victim as "a strong woman," and then described how the charged crimes unfolded in a manner similar to the prior crimes: "At around noon on August 26th, that Monday, 1991, while Gail was alone there in the church[, defendant] walked in. Just like in 1982 when he walked into Cindy [M.'s] office, [defendant] had a knife. Just like he had done before, [defendant] confronted Gail, made her get her purse and brought her back there into the minister's office in another room of the church. Just like he had before with Cindy [M.], the contents of Gail's purse were dumped on the floor at her feet and her purse was put on the floor, and he robbed Gail Johnson. [¶] Now, I mentioned that Gail was a strong-willed woman, a strong-willed woman, and at some point when [defendant] had plans for her, at some point she said no. At some point, she, too resisted just like Johnnie [C.] resisted, just like Cindy [M.] resisted. At some point Gail resisted but, unfortunately, there was no Dick Nester there to walk in right in the middle of it and save her. . . . [¶] . . . She was fighting for her life. . . . Only she didn't stop resisting like Johnnie [C.] stopped and was okay. Cindy [M.] didn't quite stop but she was saved."

Because defendant did not object to these statements, he forfeited his claim. He asserts, however, that an objection and admonition would not have cured the harm, because they only would have highlighted the insinuation that defendant committed uncharged sex crimes. As noted above, all objections draw attention to the assertedly objectionable material, but this consequence does not excuse defendant from the requirement that he object. Defendant does not explain why an admonition would not have cured any harm, or why, as he asserts, "the prosecutor's statements also constituted federal constitutional error, not subject to the contemporaneous objection or curative admonition rule." (See *Catlin, supra*, 26 Cal.4th at p. 133; *Barnett, supra*, 17 Cal.4th at p. 1182.) Alternatively, defendant contends he should not be precluded from raising the issue, because "the prosecutor's comments disclose a continuing, improper pattern of prosecutorial behavior that infected the trial with fundamental unfairness." We do not perceive such a pattern.

This claim also fails on the merits. The evidence of defendant's prior crimes was admitted *because of* similarities between those crimes and the charged crimes, and the prosecutor's statements properly focused the jury's

attention on those similarities. Contrary to defendant's suggestion, the prosecutor did not refer to matters outside the record, and the prosecutor's statement that defendant "had plans for her" was not baseless, deceptive, or otherwise unwarranted.

### d. *Insinuating guilt based upon defendant's changed appearance*

During questioning by the prosecutor, Nester confirmed that he had identified defendant in court at the preliminary hearing in the Cindy M. matter. The prosecutor then asked about changes to defendant's appearance between his attack on Cindy M. on March 29, 1982, and the preliminary hearing held on April 12, 1982. Nester testified that defendant had grown a beard and mustache, and his hair was "slicked back" rather than "big." The prosecutor asked, "Did that kind of throw you off, you thought, how could this kind of thing be allowed to happen, a person can try to disguise their appearance and be allowed to do that?" He responded, "Yes, it did." Defendant objected, "leading and suggestive." The trial court sustained the objection.

Defendant complains that the prosecutor immediately asked another question concerning defendant's appearance during the proceedings in Cindy M.'s case. Defendant's earlier objection was not to the subject matter of the questions; he objected only to the form of a particular question. Therefore, the prosecutor did not act inappropriately merely by continuing to pursue his line of questioning. For the same reason, defendant has forfeited his claim that the substance of the questions was improper.

The claim also fails on the merits. It is not improper for a prosecutor to suggest that a defendant deliberately altered his or her appearance to raise doubt concerning the defendant's identity as the perpetrator, unless the prosecutor knows that the change in appearance was motivated solely by a reason unrelated to the reason suggested by the prosecutor. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1001.) As in *Cunningham,* the prosecutor's suggestion that defendant had changed his appearance in the Cindy M. matter in order to confuse witnesses was relevant to the issues of defendant's identity and consciousness of guilt. Defendant continued to deny that he attacked Cindy M., and Nester's testimony concerning defendant's changes in appearance tended to refute defendant's denial. Also, defendant's changes in appearance tended to explain Nester's testimony that he recognized defendant in court "[o]nly by virtue of the fact that he's sitting at the defendant's table." Defendant's speculation on appeal, that "[s]urely, the prosecutor was aware that jail grooming requirements alone could have accounted for [defendant's] changed appearance," does not establish that the changes in appearance were

motivated solely by a reason other than raising doubt concerning his identity, or that the prosecutor was aware of a separate and exclusive motivation for the change in appearance.

### e. *Insinuating that defendant was concealing evidence*

During the examination of Stockwell, the prosecutor noted that the criminalist had "preserved portions of each one of these stains so the defense would have a portion of the stain to conduct their own independent re-analysis with their own criminalist; is that correct?" Stockwell responded, "It has that potential. By keeping a remaining portion of the stain, they have that ability, yes." The prosecutor then asked, "And did you release portions of many of these stains to the defense criminalist for re-analysis?" Stockwell confirmed he did. The prosecutor then stated: "I'd like to go through here and list which stains you released portions of to the defense for re-analysis, the defense criminalist—the request from this criminalist requested starting with item A-10a."

Defendant objected "to this line of questioning on the basis of relevance." Out of the presence of the jury, defendant also objected that the prosecutor was "insinuating that this was released to a criminalist hired by the defense." The trial court asked whether the evidence in fact was released to a criminalist hired by the defense, and defense counsel confirmed it was, "but we're not using that criminalist. The reports remain confidential. He's drawing an adverse inference." The court noted that "it's already in evidence that the samples were available for re-analysis," and defense counsel added, "It's also in evidence that our criminalist picked up our stuff. I believe he testified to that." The trial court concluded that, "under the authority of [*People v. Kaurish* (1990) 52 Cal.3d 648 [276 Cal.Rptr. 788, 802 P.2d 278]], I believe the evidence is admissible without mentioning the name of the [defense expert]. And, also, I think it's already in evidence. So I think what we are doing here is just turning out details of what has been said. There has been a waiver of any objections in any event. So the objection will be overruled and the evidence will be admissible." The prosecutor then reviewed with the witness, item by item, which stains were released to the defense. Because the trial court overruled defendant's objection, the prosecutor's questioning did not constitute misconduct. (*Hawthorne, supra*, 46 Cal.4th at p. 94.)

Defendant also challenges the propriety of the prosecutor's cross-examination of Dr. Mueller, during which the prosecutor asked a series of questions "to try to clarify just what you did do in this case and what you did not do in this case." He asked whether Mueller (1) conducted a test that proved defendant did not kill the victim, (2) conducted a test that proved the

blood was not defendant's blood, (3) "reanalyze[d] any of the blood . . . and show[ed] that Cellmark was wrong when they said it matched" defendant, or (4) reanalyzed any of the blood in the case. Mueller answered that he did not perform an analysis of any biological samples. The prosecutor then questioned him concerning the possibility of having a blood sample reanalyzed if the first test was not performed properly. Mueller stated there were six or seven private laboratories that perform some type of DNA testing. The prosecutor asked, "You were hired by the defense . . . to give them some advice on DNA analysis, is that correct?" Mueller responded, "On the population genetic issues." The prosecutor asked, "Did you tell them here's a lab, send that blood over there and reanalyze it?" Defense counsel interposed that he had an objection that he preferred to express outside of the presence of the jury. The court immediately responded, "The objection is sustained," and no sidebar conference occurred.

Defendant's failure to request that the jury be admonished forfeits his claim. The claim also fails on the merits. As noted above, the trial court permitted the admission of evidence establishing that portions of many of the bloodstains were preserved and released to the defense. Inquiries concerning defense testing were relevant in light of Dr. Mueller's testimony questioning Cellmark's proficiency. The prosecutor's questions suggested only what was implied by the evidence—that the defense did not possess any contrary serological evidence. Nor did the prosecutor's focus upon the absence of contrary evidence insinuate that defendant bore the burden of offering evidence of his innocence. In addition, the prosecutor's questions were not argumentative; they clearly sought to elicit relevant evidence. (*People v. Chatman* (2006) 38 Cal.4th 344, 384 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

In conclusion, we find no prosecutorial misconduct, much less a pattern of prosecutorial misconduct that would excuse defendant's failure to object to the prosecutor's questions and statements. (See *Hill, supra,* 17 Cal.4th at p. 821.)

### 9. *Cumulative error*

Defendant contends the various errors claimed to have occurred at the guilt phase, considered together, "render[ed] the proceedings fundamentally unfair and a denial of due process," in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7 and 15 of the California Constitution. We have concluded that any presumed error in ordering defendant shackled was harmless, because there is no evidence suggesting any of the jurors saw the shackles. We also have concluded that any presumed error in the jury instruction that allowed the jury to consider defendant's prior crimes as evidence of his identity as the

perpetrator was harmless, because the other evidence of identity is overwhelming. In combination, these presumed errors were harmless and did not deny defendant a fair trial.

### C. *Penalty Phase Issues*

#### 1. *Preinstruction of jurors*

Defendant contends the trial court's instructions to prospective jurors (1) failed to explain the meaning of a sentence of imprisonment for "life without the possibility of parole," (2) encouraged jurors to speculate that such a sentence did not mean defendant never would be paroled, (3) led prospective jurors to believe the responsibility for defendant's sentence rested with the appellate courts, and (4) implied a sentence of death in the present case would not be unexpected. Defendant asserts the preinstructions violated his rights to a fair trial, due process, equal protection, and a reliable penalty determination, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Before distributing copies of the juror questionnaire, the court explained to prospective jurors that this case was different from most court cases, because, if the jury found defendant guilty of first degree murder and found a special circumstance to be true, the jurors would be called upon to select one of two sentences—life imprisonment without the possibility of parole, or death. The court stated that there was some confusion and misinformation among the citizenry regarding our system of capital punishment, and that the court would "take a few minutes and talk to you about the state of the law today," to assist prospective jurors in answering the questionnaire's inquiries concerning the views of prospective jurors with respect to capital punishment. The court explained that the death penalty as prescribed in California had been determined by the United States Supreme Court to be unconstitutional. (See *Furman v. Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].) "At that time, there were many people on death row in California, and because the law under which they had been sentenced was invalidated, their sentences were commuted to life in prison. [¶] At that time there was no punishment in California known as life without parole so all those people received a sentence of life with parole possibility. And it's because of those circumstances that men like Charles Manson and Sirhan Sirhan keep coming up for parole review. [¶] I know that it makes many of our citizens very nervous to think that these men might be paroled, but what you need to know is that their cases are unique and they are considered for parole only because of that change in the law that occurred."

The court then explained that California voters adopted a new death penalty law in 1978, which "added a new punishment to California law known as life in prison without the possibility of parole. Under that punishment, a Defendant would never be released from prison. [¶] Now, this new law was tested, which took some years, and was found by both the California Supreme Court and the United States Supreme Court to be constitutional. Many people have now been convicted under this new law, and as you may be aware, many years passed before anyone was actually executed in California. [¶] Much of that time was consumed in testing the new law and the appellate review of those Defendants' cases. However, there have been two executions in California in the recent past and I anticipate that there will be many more executions in the near future. What you need to know is the following: [¶] In 1996, in California, the law means exactly what it says. If the Defendant in this case is found guilty of first degree murder and if either of the special circumstances alleged are found to be true, then the jury will have the obligation of determining which punishment to choose. [¶] There will, under those circumstances, be a second phase of the trial, which I'll explain to you in a few minutes. [¶] At the conclusion of that phase, the jury will have only two options: Death or life imprisonment without parole, and again, you are instructed that both those punishments mean exactly what they say. If you vote for life without parole, the Defendant will never be released on parole and will never be considered for release. If you vote for death, the Defendant will be executed. I'm giving you this extremely sobering information because it is important that you understand the significance of the questions that we are asking on the questionnaire and the decisions you could be required to make." The trial court then explained the nature and role of aggravating and mitigating circumstances.

We reject defendant's contention that the trial court's statements concerning potential sentences were flawed.[24] The court's statements made clear that the circumstances that led to a sentence of life imprisonment with the possibility of parole for some death row inmates were unique and transitory, and that the death penalty law at the time of trial provided only two options: life imprisonment without the possibility of parole, in which case "the Defendant will never be released on parole and will never be considered for release," and death, in which case "the Defendant will be executed." We find no basis whatsoever in the record to support defendant's view that the court's

---

[24] Defendant reviewed the remarks that the trial court proposed to give to the prospective jurors, and informed the court that he had no objection to these remarks. Nonetheless, we review his contentions, because the claimed errors might affect his substantial rights. (§ 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Dunkle* (2005) 36 Cal.4th 861, 929 [32 Cal.Rptr.3d 23, 116 P.3d 494].)

explanation "creat[ed] the erroneous illusion that [defendant], as other notorious criminals, might someday be eligible for parole," or his view that the references to notorious criminals would have inflamed the jury against defendant. Nor did the court's statements suggest, as defendant contends, that jurors would choose between "death and a limited period of incarceration." Therefore, we reject defendant's view that the court's explanations might have led a juror to believe that "the non-death option offered was neither real nor sufficiently severe," or that defendant would become eligible for parole. Finally, defendant fails to explain how the preinstruction "undermined the prosecution's burden of proof [and] permitted the jury improperly to speculate on penalty during both the guilt and penalty phases."

We also reject defendant's contention that the instructions led prospective jurors to believe that the responsibility for defendant's sentence rested with the appellate courts. (See *Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 [86 L.Ed.2d 231, 105 S.Ct. 2633] ["it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"].) The trial court's comments concerning the role of the appellate courts in testing the validity of the death penalty, and the delay in executions caused by appellate review, did not suggest that responsibility for the sentence rested with the appellate courts. Moreover, the court stated unequivocally that "[i]*f you vote for life without parole*, the Defendant will never be released on parole and will never be considered for release. *If you vote for death*, the Defendant will be executed." (Italics added.) Indeed, the court emphasized the jurors' responsibility, explaining that "I'm giving you this extremely sobering information because it is important that you understand the significance of the questions that we are asking on the questionnaire and the decisions you could be required to make."

Finally, we reject defendant's claim that the trial court's statement—"I anticipate that there will be many more executions in the near future"— "impl[ied] that a sentence of death in [defendant's] case would neither be unanticipated nor unexpected. In so stressing its expectations, the court in essence both vouched for the propriety of imposing the death penalty generally and at least implicitly urged the jury to vote for death in this case." Apparently in order to counter any impression that the 1978 death penalty legislation did not and would not lead to executions, the court explained why there had been only two executions in the eight years between the enactment

of the law and the trial in the present case, and opined that there would be "many more executions in the near future." These comments clearly did not relate to the present case, and did not reflect any expectation concerning what should happen in defendant's case. Rather, the comments underscored the fact that a sentence of death would lead to execution.[25]

### 2. *Instruction concerning victim-impact evidence*

Defendant contends the trial court's refusal to give his proposed instruction concerning victim-impact evidence violated his right to a decision by a rational and properly instructed jury, his due process right to a fair trial, and his right to a fair and reliable penalty determination, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7, 15, 16, and 17 of the California Constitution.

Defendant requested the following instruction: "Evidence has been introduced that may arouse in you a natural sympathy for the victim or the victim's family. [¶] You must not allow such evidence to divert your attention from your proper role in deciding the appropriate punishment in this case. [¶] You may not impose the penalty of death as a result of an irrational, purely emotional response to this evidence."

We rejected the following, similar instruction in *People v. Ochoa* (2001) 26 Cal.4th 398, 455 [110 Cal.Rptr.2d 324, 28 P.3d 78]: " 'Evidence has been introduced for the purpose of showing the specific harm caused by the Defendant's crimes. Such evidence was not received and may not be considered by you to divert your attention from your proper role of deciding whether the Defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons for the Jury to show mercy to the Defendant.' " We concluded in *Ochoa* that "[t]he proposed instruction

---

[25] Defendant complains that in preinstructing most of the prospective jurors that, in determining the appropriate penalty, they would consider all of the evidence received during any part of the trial, the trial court did not add the phrase "except as otherwise instructed." Defendant does not include any argument concerning this omission, and therefore has forfeited any related claim. (See *Catlin, supra,* 26 Cal.4th at p. 133; *Barnett, supra,* 17 Cal.4th at p. 1182.) In any event, the trial court subsequently instructed the jurors at the penalty phase, pursuant to CALJIC No. 8.84.1, that "[y]ou must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial."

would not have provided the jury with any information it had not otherwise learned from CALJIC No. 8.84.1, and the trial court properly refused to read [the proposed] instruction . . . ." (*Ochoa, supra,* 26 Cal. at p. 455.) The trial court in the present case also instructed the jury, pursuant to CALJIC No. 8.84.1, that "[y]ou must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings. Both the People and the Defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict." As in *Ochoa,* defendant's proposed instruction would not have provided the jury with any information not otherwise furnished by CALJIC No. 8.84.1. Contrary to the views expressed by defendant, we do not believe the jurors would have interpreted the words "bias" and "prejudice" in CALJIC No. 8.84.1 to refer exclusively to racial or religious discrimination, or that jurors would have interpreted the phrase "public opinion or public feelings" to exclude the sentiments expressed by the victim's family.

### 3. *Cumulative error*

Defendant asserts that the errors committed at the guilt phase and the penalty phase, considered together, "so infected [defendant's] trial with unfairness as to make the resulting conviction fundamentally and inherently unfair and a denial of due process of law, and the judgment of death constitutionally unreliable," in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We have concluded that any presumed error in ordering defendant shackled was harmless, because there is no evidence suggesting any of the jurors saw the shackles. We also have concluded that any presumed error in the instruction that allowed the jury to consider defendant's prior crimes as evidence of his identity as the perpetrator of the present offenses was harmless, because the other evidence of identity is overwhelming. In combination, these presumed errors were harmless and did not deny defendant a fair trial.

### D. *General Challenges to California's Death Penalty Scheme*

### 1. *Instructions concerning mitigating and aggravating factors*

Defendant contends the jury instructions regarding mitigating and aggravating factors, and the jurors' application of these factors, rendered defendant's death sentence arbitrary and capricious, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### a. *The circumstances of the crime*

 The trial court instructed the jury, pursuant to CALJIC No. 8.85, to "consider and take into account and be guided by the [factors set forth in

section 190.3] if applicable."[26] The first factor is "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." (§ 190.3, factor (a).) Defendant acknowledges that the United States Supreme Court rejected a challenge to factor (a) based upon the provision's asserted vagueness (*Tuilaepa II, supra*, 512 U.S. 967, 975–980), but he contends that, as applied over time, factor (a) has become arbitrary and capricious.[27] He relies upon the variety of circumstances that have been invoked by prosecutors in other cases to support imposition of the death penalty, such as that the victim was a child, an adolescent, a young adult, in the prime of life, or elderly; the victim was killed by a single wound, or by multiple wounds; the victim struggled, or the victim did not struggle; or the victim had a prior relationship with the defendant, or was a stranger to the defendant. It was apparent in *Tuilaepa II* that factor (a) would allow wide-ranging and arguably contradictory circumstances to be urged as aggravating factors. In his dissenting opinion, Justice Blackmun complained that factor (a) "has been exploited to convince jurors that just about anything is aggravating," including that the defendant killed for a motive or for no motive; killed in cold blood or hot blood; attempted to conceal the crime or made no attempt to conceal the crime. (*Tuilaepa II, supra*, 512 U.S. at pp. 986–987 (dis. opn. of Blackmun, J.).) Similarly, the majority in *Tuilaepa II* acknowledged in connection with section 190.3, factor (i)—the age of the defendant at the time of the crime—"that in the typical case the prosecution argues in favor of the death penalty based on the defendant's age, no matter how old or young he was at the time of the crime." (*Tuilaepa II*, at p. 977.) This reality did not cause the majority concern; rather, it viewed competing advocacy concerning the significance of any particular factor as helpful to the jury. "Competing arguments by

---

[26] The court also instructed that "[p]otential aggravating factors are limited to those listed in *CALJIC No. 8.85* factors A, B, and C only. You may not consider any other evidence as an aggravating factor. You may not consider the absence of mitigating factors as an aggravating factor. You may not consider the same facts more than once in determining the presence of aggravating factors." (Italics added.) Defendant complains that "the court did not define what it meant by the reference to CALJIC No. 8.85." No definition or explanation of this reference was required. This instruction was given immediately after CALJIC No. 8.85's description of the factors that could be considered, and its reference to "factors A, B, and C" could only have been to the factors just described. In addition, the court provided the jurors with a copy of the instructions, and the CALJIC No. 8.85 instruction was labeled with its CALJIC number at the end of that instruction. (See *People v. Mills* (2010) 48 Cal.4th 158, 200–201 [106 Cal.Rptr.3d 153, 226 P.3d 276] (*Mills*) [the court presumes jurors follow the court's instructions, including the written instructions].)

[27] The People assert defendant forfeited this challenge by failing to advance it in the trial court. As the People acknowledge, however, "this court has consistently considered 'as applied' challenges to California's death penalty law . . . on their merits without discussing whether they were raised at trial. [Citations.]" (*People v. Hernandez* (2003) 30 Cal.4th 835, 863 [134 Cal.Rptr.2d 602, 69 P.3d 446].) As in *Hernandez*, we need not decide whether an objection was necessary, because defendant's contention lacks merit in any event.

adversary parties bring perspective to a problem, and thus serve to promote a more reasoned decision, providing guidance as to a factor jurors most likely would discuss in any event." (*Ibid.*) As we observed in *People v. Brown* (2004) 33 Cal.4th 382 [15 Cal.Rptr.3d 624, 93 P.3d 244], the range of circumstances considered in capital cases "reflects . . . that each case is judged on its facts, each defendant on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances. [Citation.]" (*Id.* at p. 401.) Thus, it is clear that the history of the circumstances identified by prosecutors as aggravating under factor (a) does not render the sentencing scheme arbitrary or capricious.

### b. *Prior criminal activity*

 The second factor in section 190.3 is "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) The trial court instructed the jury, pursuant to CALJIC No. 8.87, that evidence had been introduced for the purpose of showing that defendant had engaged in such activity, including the robbery and forcible rape of Johnnie C., the kidnapping, robbery, forcible rape, and forcible oral copulation of Dinah J., the robbery and assault with intent to commit rape of Cindy M., and the threats to use force against Bunny Lynn Miles's daughter. It explained that "[b]efore a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant . . . did in fact commit such criminal acts. . . . [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation."

Defendant claims error in the admission of "unreliable" evidence of his unadjudicated crimes of oral copulation with respect to Dinah J. and of threats with respect to Miles, and the failure to require that the jury unanimously find the unadjudicated activity to be true before considering it under section 190.3, factor (b). We repeatedly have rejected claims that evidence of unadjudicated criminal activity should not be admitted, as well as claims that the jury must make unanimous findings with respect to evidence admitted under factor (b).[28] We also have rejected the contention that the

[28] Defendant does not address in what way the particular evidence of unadjudicated criminal activity was "unreliable." Rather, his theory seems to be that allowing a single juror to rely upon such evidence, in the absence of a *unanimous* finding that the unadjudicated criminal activity occurred, renders the process unreliable. Thus, his characterization of the evidence as "unreliable" presents no issue different from what we have considered in the cases cited above,

decisions in *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (*Blakely*), *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] (*Ring*), and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*) require otherwise. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 308 [106 Cal.Rptr.3d 459, 226 P.3d 949] (*D'Arcy*) [the court need not instruct that the jury must unanimously find true an aggravating factor; *Blakely, Ring,* and *Apprendi* do not alter this conclusion]; *Mills, supra,* 48 Cal.4th at p. 214 [Cal.'s death penalty law is not invalid for failing to require unanimous findings of aggravating factors, nor for permitting consideration of unadjudicated criminal activity; *Blakely, Ring,* and *Apprendi* do not preclude consideration of unadjudicated criminal activity].) Finally, we have rejected the contention that allowing consideration of unadjudicated criminal activity in capital cases, while forbidding its consideration in noncapital cases, violates a defendant's right to equal protection of the laws. (*D'Arcy, supra,* 48 Cal.4th at p. 301.) Defendant provides no reason for us to reconsider these decisions.

### c. *Restrictive adjectives in the description of mitigating factors*

The jury was instructed, pursuant to CALJIC No. 8.85, that it could consider "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," and "[w]hether or not the defendant acted under extreme duress or under the substantial domination of another person." Defendant asserts that the adjectives "extreme" and "substantial" "acted as a barrier to the consideration of mitigation." We repeatedly have rejected this contention. (*Gamache, supra,* 48 Cal.4th at p. 406 [use of the word "extreme" did not prevent the jury from considering relevant mitigating evidence]; *D'Arcy, supra,* 48 Cal.4th at p. 308 [use of "extreme" and "substantial" does not violate the 5th, 6th, 8th, or 14th Amends.]; *Mills, supra,* 48 Cal.4th at pp. 210–211 [rejecting challenge to use of the word "extreme"].)

### d. *The absence of a requirement of written findings*

Defendant also claims error in the failure to require written findings regarding the aggravating factors found and considered by the jury in

---

which reject the contention that the jury must be required to reach a unanimous conclusion regarding the presence of an aggravating factor.

selecting the punishment of death. We repeatedly have rejected this contention. (*Gamache, supra,* 48 Cal.4th at p. 406 [there is no state or federal requirement of written findings]; *Mills, supra,* 48 Cal.4th at p. 214 [the death penalty law is not unconstitutional for failing to require written findings].)

### 2. *Instructions concerning the jury's consideration of aggravating and mitigating circumstances*

Defendant contends the trial court's instruction, pursuant to CALJIC No. 8.88, concerning the meaning and weighing of aggravating and mitigating circumstances, deprived him of his rights to due process, equal protection, a fair trial by jury, and a reliable penalty determination of penalty, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[29]

First, he challenges the instruction that, "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." He asserts that the phrase "so substantial" is impermissibly vague, citing *Arnold v. State* (1976) 236 Ga. 534 [224 S.E.2d 386], which invalidated an instruction that described, as an aggravating circumstance, that the defendant " 'has a substantial history of serious assaultive criminal convictions.' " (*Id.,* 224 S.E.2d at p. 391.) According to the Georgia court, "Whether the defendant's prior history of convictions meets this legislative criterion is highly subjective." (*Id.* at p. 392.) We previously have rejected this contention. (*People v. Page* (2008) 44 Cal.4th 1, 55–56 [79 Cal.Rptr.3d 4, 186 P.3d 395]; *People v. Breaux* (1991) 1 Cal.4th 281, 316 [3 Cal.Rptr.2d 81, 821 P.2d 585].) As we explained in *Page,* the difference between the two uses of the phrase arises from the different contexts of its usage. "The jurors in *Arnold* were called upon to decide, in isolation and without further guidance, whether a defendant's prior criminal record was 'substantial,' whereas the jurors [instructed pursuant to the CALJIC instructions] were instructed extensively with respect to the manner of performing their task and were called upon to compare the totality of the aggravating circumstances with the totality of the mitigating circumstances. The instructions adequately explained that the jurors 'could return a death

---

[29] The People contend defendant forfeited these claims by failing to assert them in the trial court. Because his claims of error would affect his substantial rights, we address them. (§§ 1259, 1469.)

verdict only if aggravating circumstances predominated and death is the appropriate verdict.' [Citation.]" (*Page, supra,* 44 Cal.4th at p. 56.)

Second, defendant complains that the instruction failed to inform the jurors that the central determination entrusted to them is whether the death penalty is the appropriate punishment, not merely an authorized punishment. As we have explained, however, "[b]y advising that a death verdict should be returned only if aggravation is 'so substantial in comparison with' mitigation that death is 'warranted,' the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty. [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980]; see also *People v. Taylor* (2009) 47 Cal.4th 850, 899–900 [102 Cal.Rptr.3d 852, 220 P.3d 872] (*Taylor*); *People v. Griffin* (2004) 33 Cal.4th 536, 593 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

Third, defendant complains that the instruction failed to inform the jurors that if the mitigating circumstances outweighed the aggravating circumstances, they were required to return a sentence of life imprisonment without the possibility of parole. Again, we previously have rejected this contention. The principle that jurors "must return a verdict of life without [the] possibility of parole if mitigation outweighs aggravation . . . is clearly implicit in the standard instruction." (*Taylor, supra,* 47 Cal.4th at p. 900.)

### 3. *Burden of proof and other safeguards*

Contrary to defendant's contentions, this court consistently has held that the trial court is not "required to instruct the penalty jury on any burden of proof; in California, at the penalty phase, there is no burden of proof, only a normative judgment for the jury. [Citations.]"[30] (*Gamache, supra,* 48 Cal.4th at p. 407.) Nor must the jury unanimously agree with respect to any particular aggravating circumstance, find all aggravating factors beyond a reasonable doubt, find that the aggravating circumstances outweigh the mitigating circumstances, or find that death is the appropriate penalty. (*Id.* at pp. 406–407; *D'Arcy, supra,* 48 Cal.4th at p. 300; *People v. Cruz* (2008) 44 Cal.4th 636, 681 [80 Cal.Rptr.3d 126, 187 P.3d 970].) The decisions in *Blakely, supra,* 542 U.S. 296, *Ring, supra,* 536 U.S. 584, and *Apprendi, supra,* 530 U.S. 466, do not affect these conclusions. (*D'Arcy, supra,* 48 Cal.4th at pp. 300–301; *Mills,*

---

[30] Notwithstanding this principle, defendant asserts the trial court should have given his proposed instruction that defendant had no burden to prove the existence of a mitigating factor. As noted above, the trial court was not required to instruct on any burden of proof. In any event, defendant withdrew this proposed instruction.

*supra*, 48 Cal.4th at p. 214; *People v. Martinez* (2010) 47 Cal.4th 911, 967 [105 Cal.Rptr.3d 131, 224 P.3d 877].) Finally, "[t]he federal Constitution does not require that the jury be instructed on a presumption in favor of a sentence of life imprisonment without possibility of parole. [Citations.]" (*D'Arcy*, *supra*, 48 Cal.4th at p. 301.)

### 4. *Intercase proportionality review*

Defendant contends the absence of intercase proportionality review violates his rights to a fair trial, due process, and equal protection, and to be free from arbitrary and capricious imposition of the death penalty, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. He concedes that the United States Supreme Court and this court have rejected this contention. (*Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871]; *Gamache, supra*, 48 Cal.4th at p. 407.) "First, intercase proportionality review . . . is not required to render California's sentencing scheme constitutional. [Citations.] Second, the equal protection clause does not require California to include in its capital sentencing scheme the same disparate sentence review previously provided noncapital convicts under the Determinate Sentencing Act. [Citations.]" (*Gamache*, at p. 407.) Defendant offers no persuasive reason for us to reconsider this conclusion.

### 5. *International law*

Defendant contends California's death penalty scheme violates the prohibition against "cruel, inhuman or degrading treatment or punishment," set forth in article VII of the International Covenant on Civil and Political Rights. He also contends that evolving international norms render a sentence of death "cruel and unusual" under the Eighth Amendment to the United States Constitution, particularly to the extent this sentence is employed as a regular punishment for a substantial number of crimes. We have concluded, however, that "California's use of capital punishment as an authorized sentence for certain specified types of first degree murder does not constitute cruel and unusual punishment merely because most nations have chosen not to employ the death penalty at all. [Citations.] Nor does our statute violate the International Covenant on Civil and Political Rights. [Citations.]" (*Taylor, supra*, 47 Cal.4th at p. 900; see also *D'Arcy, supra*, 48 Cal.4th at p. 309; *Mills, supra*, 48 Cal.4th at p. 215.)

## III. CONCLUSION

For the foregoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.